UNITED STATES of America, Appellee,

v.

Clayton HOELSCHER, Appellant.

UNITED STATES of America, Appellee,

v.

Mickie James
MERIWETHER, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph HAAG, Appellant.

UNITED STATES of America, Appellee,

v.

Steven Carl McGIRT, Appellant.

UNITED STATES of America, Appellee,

v.

Michael MOIT, Appellant.

UNITED STATES of America, Appellee,

v.

Alfred GIUFFRIDA, Appellant.

Nos. 89–2973 through 89–2975, 89–3017, 89–3064, 90–1101.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1990.

Decided Sept. 18, 1990.

Rehearing Denied Oct. 29, 1990.

Rehearing and Rehearing En Banc Denied in Nos. 89–2974 and 90–1101 Nov. 6, 1990.

N. Scott Rosenblum, St. Louis, Mo., for appellant Hoelscher.

James C. Delworth, St. Louis, Mo., for appellant Meriwether.

John E. Bardgett, St. Louis, Mo., for appellant Haag.

Stephen J. Nangle, St. Louis, Mo., for appellant McGirt.

Carl F. James, Wentzville, Mo., for appellant Moit.

Stephen H. Gilmore, St. Louis, Mo., for appellant Giuffrida.

Michael Reap, St. Louis, Mo., for appellee.

Before FAGG and BEAM, Circuit Judges, and WOODS,* District Judge.

HENRY WOODS, District Judge.

The appellants in these consolidated appeals were members of a cocaine distribution ring operating in the St. Louis area, with supply connections in California. Other than the appellants, indictments were secured against Michael Salsman, Dianna Bilyeu and Donald Mantro who pled guilty to drug offenses in connection with activities of the group. Appellant Giuffrida also pled guilty but now appeals, alleging errors in sentencing and in denying his motion to withdraw his guilty plea. The other five appellants entered not guilty pleas and were tried jointly before a jury in the United States District Court for the Eastern District of Missouri.[1] On September 1, 1989, guilty verdicts were returned against appellants Michael Moit, Joseph Haag, Steven Carl McGirt, Mickie Meriwether and Clayton Hoelscher, and sentences were imposed ranging from 78 months to 120 months. Giuffrida received 220 months on his guilty plea. All filed separate appeals

and are represented by separate counsel. Since they raise different grounds for reversal, along with some common grounds, the points raised by each will be discussed, *infra*, along with the specific statutory offenses charged against each appellant. We note, however, at the outset that no prejudicial error is found in the conduct of this lengthy trial and affirm the judgment of conviction as to all six appellants.

The success of the prosecution in this case is due in large measure to the activities of Frank Bennett, a confidential informant who began cooperating with the Federal Bureau of Investigation and Internal Revenue Service in the fall of 1988. On November 17, 1988, Bennett, an employee of Michael Salsman, saw Giuffrida give Salsman a kilo of cocaine, after which Bennett drove Salsman to Moit's house to break up and weigh it since Moit had a scale. Salsman told Bennett later that Moit had received six ounces of the cocaine. The next day Salsman delivered cocaine to a number of other individuals including appellant Clayton Hoelscher at his bar in Troy, Missouri. Three days later on November 21, 1988 Bennett observed Hoelscher giving Salsman $5,000 in cash, which coincided with a bank withdrawal of an identical amount by Hoelscher on the same date.

On December 10, 1988, Bennett saw Salsman pay Giuffrida $10,000 for a kilo of cocaine. Again Bennett and Salsman went to Moit's house to break up the cocaine, which was distributed to other dealers. Salsman told Bennett that Moit received eight ounces of the cocaine. Bennett did not observe any delivery to Hoelscher after the transaction. Salsman received $4,500 from Hoelscher during this time frame.

Salsman received a third kilogram from Giuffrida on January 13, 1989. The same visit to Moit's house was made by Bennett and Salsman. Bennett observed the breaking of the cocaine into smaller packages and its weighing. Moit kept six ounces and

---

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

the remainder was distributed to others including Hoelscher.

On January 19, 1989 Bennett recorded a conversation between Moit and Salsman in which Salsman remarked that Clay Hoelscher wanted 20 more ounces of cocaine. Moit complained that one of his customers, who owed him $2,800, lost these funds in a burglary and could only pay $500. He also complained about a competitor undercutting him on price in Wright City, Missouri. Moit also mentioned trading an ounce of cocaine for $2,000 in repairs on his truck. On the next day Bennett recorded a conversation with Haag and Salsman in which Haag expressed admiration for the boldness of black cocaine dealers and the quality of their product.

While Salsman was contemplating a trip to California for a supply of cocaine, Bennett recorded a conversation on January 30, 1989 between Salsman and Hoelscher in which the latter suggested a source in Columbia that might obviate a California buy. The Columbia buy did not materialize and plans were made by Salsman to obtain three to five kilograms of cocaine in California.

Giuffrida contributed $45,000 to this buy. Others contributed $21,000, including Mantro, one of the co-conspirators who entered a guilty plea. On February 7, 1989, Salsman sent Bennett to California in a rented Winnebago with $65,000 concealed inside the panelling. In Los Angeles Bennett was to meet Salsman, Haag, who was to receive some of the cocaine, and "Cedric," a black male who was to assist in making the California buy. While en route to California on February 9, 1989, Bennett talked by telephone to Salsman and Haag, who had flown to Los Angeles and were at the Viscount Hotel. He learned that "Cedric" had failed to arrange the drug buy and had been beaten up for his efforts. "Cedric" was sent back to St. Louis.

Haag persuaded Salsman to remain in Los Angeles and develop another source. He suggested that appellant McGirt, back in St. Louis, had a cocaine source in Los Angeles. On February 10, 1989 Bennett, Haag and Salsman checked into Room 2169 of the Airport Marriott Hotel, from which Haag contacted McGirt and convinced him to come to Los Angeles.

A Los Angeles deputy sheriff saw Salsman, Haag, McGirt and appellant Meriwether meet at the airport on February 10, 1990. McGirt checked into Room 2167 at the Airport Marriott. On February 11, 1989 Bennett met with McGirt, Haag and Salsman. Haag snorted some cocaine given to him by McGirt, which the latter had obtained from Meriwether. Salsman instructed Bennett to retrieve the money from the Winnebago, and $60,000 was counted by Bennett, Haag, Salsman and McGirt and given to McGirt. A surveillance by the Los Angeles sheriff's department traced McGirt to a meeting with Meriwether prior to the their driving away in a maroon/black Cadillac, a vehicle again observed at the time a search warrant was executed on Meriwether.

Salsman, Haag, McGirt and McGirt's girl friend returned to St. Louis. Meriwether delivered the cocaine to Bennett along with $6,500, of which $760 was returned to Meriwether. Bennett drove back to St. Louis with the money and the cocaine. He contacted Haag and set up a meeting at the Henry VIII Inn, St. Louis for February 15, 1989. The meeting was monitored by audio and video tapes. At this meeting Salsman and Haag tasted the cocaine. Haag mentioned that Giuffrida had an additional $45,000. He was concerned about a possible theft if they continued "fronting the money." He also mentioned telling his people about the cocaine and referred to his brother as having a triple beam scale. When Haag and Salsman left, the latter had physical possession of a kilo of the cocaine and the money returned to Bennett by Meriwether. They were immediately arrested. Subsequently Giuffrida came to the Henry VIII Inn with Dianna Bilyeu, whom he had designated to pick up his share of the cocaine. They were arrested upon their departure. After the execution of a search warrant on his residence in Los Angeles, appellant Meriwether was arrested on February 15, 1989.

In Count I of the indictment the appellants, along with Michael Salsman, Donald Mantro and Dianna Bilyeu, were indicted for violation of Title 21 U.S.C. § 846 (conspiracy to distribute cocaine). In Count II Salsman was indicted for an additional violation of distribution of cocaine. Along with McGirt, Salsman and Haag were charged with violation of Title 18 U.S.C. § 1952(a)(3) in Count III (interstate transportation in Aid of Racketeering). Haag and Salsman were charged in Count IV with violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II) (possession with intent to distribute 2.2 pounds of cocaine on February 15, 1989) and in Count V for violation of the same section by distributing 4.4 pounds of cocaine on the same date. Alfred Giuffrida and Dianna Bilyeu were charged in Count VI with violation of the same section by possession of 4.4 pounds of cocaine with intent to deliver. Salsman was charged in Count VII with violation of 21 U.S.C. § 848 (continuing criminal enterprise) and in Count VIII for filing a false tax return in violation of Title 26 U.S.C. § 7206(1).

Prior to trial Salsman pled guilty to the continuing criminal enterprise and tax violation (Counts VII and VIII) and received a sentence of 280 months. Alfred Giuffrida pled guilty to Count VI as did Dianna Bilyeu. The former received a sentence of 220 months and the latter 63 months. Prior to trial Donald Mantro pled guilty to a superseding felony information and received a sentence of 41 months.

A recitation of the above facts which are supported by substantial evidence demonstrates that each of the appellants was deeply involved in a conspiracy to distribute large quantities of cocaine. Giuffrida, Salsman and Haag provided directions for the conspiracy and furnished the operating funds. Hoelscher and Moit were middlemen and wholesalers in the chain of distribution, while McGirt and Meriwether were involved with procuring a supply of the product in California. Evidence implicating all of the appellants is both direct and circumstantial. We now address the specific contentions of the appellants.

## I. JOSEPH HAAG

### A. *Sufficiency of the Evidence*

■ The statement of facts set forth above demonstrates that Haag was a major player in this conspiracy. While perhaps not as important to the operation as Salsman, who appears to have been the principal mover and shaker, Haag was Salsman's constant companion and advisor and was present at key events in the operation of the conspiracy.

The evidence is clear that without Haag's input, the trip to California would have been futile. After the first connection to a source in Los Angeles proved fruitless, Salsman wanted to give up. It was Haag who persuaded him to try another connection, and it was Haag who established this connection, persuading McGirt to come to Los Angeles and develop the source through Meriwether. (Tr. II:107–110).

Haag's importance in this phase of the operation is shown by the fact that when Bennett arrived from Los Angeles he called Haag, who notified the others to come to the Henry VIII Inn on February 15, 1989. Haag was the first to arrive at the Inn. (Tr II:120–27). He sampled the cocaine by tasting it and was to receive six ounces. Haag, who accompanied Salsman to California, was principally responsible for securing a supply of cocaine in California for distribution back in St. Louis. He was also a key link in obtaining the cocaine from Bennett and assuring its delivery to Alfred Giuffrida and Dianna Bilyeu. (Tr II:134–35). There was thus substantial evidence to support the jury's conviction on the four counts of the indictment in which he was named. Haag argues that there is no direct evidence that he had agreed to become a member of the conspiracy. He claims that he was simply an innocent associate of Salsman. The facts belie such an argument, and it cannot be sustained in the case law. "The agreement may be established by circumstantial evidence, as conspiracies seldom lend themselves to proof by direct evidence." *United States v. Kaminski*, 692 F.2d 505, 513 (8th Cir.1982). While we do not regard the evidence of Haag's in-

volvement in this conspiracy as slight, "[o]nce the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *United States v. De Luna,* 763 F.2d 897, 924 (8th Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985), quoting with approval from *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir.1977).

■■■ Proof of a formal agreement is not necessary to prove the existence of an agreement. Proof of a common plan or tacit understanding is sufficient. *United States v. Powell,* 853 F.2d 601, 604 (8th Cir.1988); *United States v. Campbell,* 848 F.2d 846, 851 (8th Cir.1988); *United States v. Massa,* 740 F.2d 629, 636 (8th Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *Nilva v. United States,* 212 F.2d 115, 121 (8th Cir.1954), *cert. denied* 348 U.S. 825, 75 S.Ct. 40, 99 L.Ed. 650 (1954). Once a person joins a conspiracy, as Haag undoubtedly did by flying to California with Salsman and playing a major role in obtaining a large amount of cocaine for distribution in the St. Louis area, he assumes full liability for the conspiracy even though he joined in the later stages. *Blumenthal v. United States,* 332 U.S. 539, 556–58, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947). The evidence detailed in the introduction, *supra,* is not only sufficient to sustain Haag's conviction of conspiracy (Count I) but also of possession (Count IV) and distribution (Count V) of cocaine. It also sustains his conviction under the Travel Act, Title 18 U.S.C. § 1952(a)(3).

The evidence is overwhelming that Haag engaged in interstate travel to promote, establish, manage and carry on a scheme to obtain and distribute large quantities of cocaine. He not only traveled from St. Louis to Los Angeles to facilitate this project but persuaded McGirt to make a similar interstate trip. There was substantial evidence that Haag engaged in a continuous course of conduct to promote drug

trafficking and that his interstate travel was a part of this enterprise. His activities were similar to those of other conspirators, whose convictions have been affirmed by this court for violations of the Travel Act. *See United States v. Spector,* 793 F.2d 932, 936 (8th Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987); *United States v. Krevsky,* 741 F.2d 1090, 1094 (8th Cir.1984).

B. *Refusal of Haag's Proffered Instruction No. 4*

■■■ Haag offered instruction No. 4 reading as follows:

Mere presence at the scene of a sale, purchase, or transfer of illegal drugs, or mere similarity of conduct among various persons and the fact they may have associated with each other, and may have assembled together and discussed common aims and interests, does not establish proof of membership in, or the existence of, a conspiracy.

The court refused this instruction but covered essentially the same concept in the second paragraph of Instruction No. 19, defining the crime of conspiracy. This paragraph reads as follows:

Mere similarity of conduct among various parties and the fact that they may have associated with each other, and may have assembled together, and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

(App. 207).

■■■ Therefore, the court did not err in refusing Instruction No. 4. Additionally, the record does not disclose that Haag advanced any reason why Instruction No. 4 should have been given nor did he make timely and specific objections for the failure of the court to give the instruction. (Tr. VI:21–23). Merely offering a requested instruction to the trial judge for consideration is not sufficient to preserve the error and satisfy Fed.R.Crim.P. 30. *United States v. Hecht,* 705 F.2d 976, 978 (8th Cir.1983).

The instruction offered by Haag is objectionable for another reason. The evidence

shows beyond all peradventure that Haag was not "merely present" at the sale, purchase and transfer of illegal drugs but was an active participant in these activities.

### C. Alleged Evidentiary Errors

■ Haag claims that the court erred in permitting Bennett to testify as to an oral statement by Haag concerning receipt of six ounces of the cocaine bought in California. (Tr. II:104). The statement was clearly admissible since it was a statement by a co-conspirator during the conspiracy. Haag, however, contends that the statement was discoverable under Fed.R. Crim.P. 16, which he had invoked. This rule does not cover testimony by a government witness as to an oral statement by a conspirator in the course of the conspiracy. It covers oral statements made by defendant "in response to interrogation by any person then known to the defendant to be a government agent." *United States v. Vitale*, 728 F.2d 1090, 1093–94 (8th Cir.1984). Rule 16 provides that statements of Government witnesses are not discoverable except as provided by Title 18 U.S.C. § 3500, the Jencks Act.

■ The statement was discoverable under Title 18 U.S.C. § 3500, provided it was (1) a written statement made by the government witness and signed or otherwise adopted or approved by him, or (2) a stenographic, mechanical, electrical or other recording or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement.

The Government did not know about Haag's statement to Bennett until the day before Bennett testified. It was never recorded into a memorandum or interview and adopted as true and correct by Bennett. Bennett testified about the statement on direct examination without objection (Tr. II:106) and was cross-examined vigorously by Haag's counsel about the statement. (Tr. II:167–72, III:4–11). FBI Agent Abrams learned about the Haag statement the day before Bennett testified. (Tr. III:206). There is much resemblance

to *United States v. Taylor*, 599 F.2d 832, 836 (8th Cir.1979). The Government's chief witness, just as in the instant case, testified to a damaging statement by defendant. "Shortly before trial, Worley informed the government's counsel of the threat but no transcription was made of this statement." *Id.* at 839. This is precisely what happened in the case at bar. "The appellant did not object at trial to this examination on the basis of a Jencks Act violation or for reason of irrelevance or prejudice. Accordingly, the appellant is precluded from raising these issues here." *Id.* at 839. We hold that it was not error to admit this statement.

■ Haag also claims that the court erred in refusing to permit the introduction of FBI reports furnished to him as Jencks Act material. Those reports appear as Exhibits 9, 10, 12, 13, 15, 17 and 23 and are set out in the Joint Appendix of Hoelscher, Haag and McGirt, pp. 429–438. This material was furnished to appellant and was used extensively on cross-examination to elicit testimony deemed favorable to Haag. We have carefully examined this material. It consists of FBI interviews with Bennett and other Government witnesses, as well as surveillance reports of the FBI and other law enforcement officers. Other defendants objected to the introduction of these reports because they contain material incriminating them. Significantly Haag did not move for the introduction of all the FBI interviews and surveillance reports but only selected ones with infrequent mention of his name. It is apparent that Haag utilized these reports to the fullest extent in his defense. The court did not err in refusing to permit the actual FBI reports to be introduced. Haag was in no wise prejudiced by this ruling.

■ Haag also claims that the Government improperly introduced evidence of an arson allegedly committed by Haag at Salsman's behest. This evidence was contained in the videotape of a meeting between Haag, Bennett and Salsman on February 15, 1989. At Haag's request this portion of the tape was deleted and not shown to the jury. It was not brought out by the

Government on its direct examination of Bennett but was injected by co-defendant Hoelscher on cross-examination. (Tr. III:129). We note that the trial judge firmly admonished the jury that the defendants were on trial only for conduct alleged in the indictments. (Tr. III:133–34). In refusing to grant Haag's motion for a mistrial, the trial judge did not abuse his discretion which is the standard of review. *United States v. O'Connell*, 841 F.2d 1408, 1427 (8th Cir.1988).

Haag charged serious prosecutorial misconduct in violating a purported agreement to exclude the testimony. Whether there was such a violation is arguable. But even if there was prosecutorial misconduct, it does not follow that the trial judge abused his discretion in denying a mistrial. The recent decision of this court in *United States v. Figueroa*, 900 F.2d 1211, 1216 (8th Cir.1990) thoroughly considered this issue and reiterated the standards to be followed in reviewing the trial court's actions:

> In assessing the prejudicial impact of the prosecutorial misconduct, we consider the following: "1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence; and 3) the curative actions taken by the trial court." *United States v. Andrade*, 788 F.2d 521, 530–31 (8th Cir.1986), *cert. denied sub nom.* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986).
>
> .... We must view the prosecutorial misconduct in the context of the entire trial, *United States v. Dawkins*, 562 F.2d 567, 568 (8th Cir.1977), and when we do so, particularly in light of the substantial and persuasive evidence of guilt, we conclude that the misconduct was no more than harmless error. *See United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 239–42, 60 S.Ct. 811, 851–53, 84 L.Ed. 1129 (1940).
>
> Moreover, we are satisfied that the court's curative actions here dispelled any potential for undue prejudice stemming from the improper remarks.

These comments apply with particularity to the case now before us.

### D. *Non–Disclosure of Payment to Government Informant*

Haag claims error in the failure of the Government to disclose payment by the IRS of $1500 to Bennett plus extending to him a moratorium on a civil tax debt of $42,000. Haag admits that the Government provided information as to monies paid to Government witness Bennett for his living expenses. Bennett had personally worked out a schedule of payments to liquidate his liability to the IRS. The FBI had arranged for a moratorium while he was acting as an informant. The IRS had paid Bennett $1,500. The exact reason for this payment is unclear. The only phase of the case in which the IRS had an interest was the indictment and conviction of Salsman for tax evasion. Presumably Bennett was paid in connection with this investigation. This was a minor facet of this criminal enterprise and affected only Salsman who pled guilty.

Conceding that the information should have been furnished to Haag, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) we find his argument for reversal to be without merit for the simple reason that no prejudice has been demonstrated. On cross-examination Haag's counsel developed information about both the $1,500 payment and the tax moratorium. (Tr. III:35–38, 196). We are convinced that this result would not have been changed or that Haag's trial tactics would have been different had this information been furnished to defense counsel before trial. As this court said in *United States v. Risken*, 788 F.2d 1361, 1375 (8th Cir.1986):

> The government should have disclosed the implied understanding that existed between Greenfield and the FBI about the possibility of a post-trial payment. The defense could have used this information to further impeach Greenfield's credibility. Nonetheless, Greenfield's status as a paid government witness and his employment by the FBI as a paid informant had already been brought out before the jury, although the payments which had been disclosed to the defense

and to the jury were substantially less than the post-trial payment. More importantly, however, the government's case did not depend upon Greenfield's testimony alone.

*See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), holding that a conviction must be reversed "only if the evidence is material in the sense that its suppression would undermine confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. at 3381. In a case decided August 31, 1990, this court made the following significant comment: "The *Bagley* test, however, requires that we determine whether the withheld information probably would have caused the jury to reach a different result." *Orsini v. Wallace,* 913 F.2d 474, 481 (8th Cir.).

### E. *Alleged Guidelines Violation*

■ Haag's contention with respect to the Guidelines are completely without merit. He claims to have been a "minimal participant" who should have been given a four level downward departure. We agree with the trial judge. The evidence outlined, *supra,* established that Haag was a major participant in this cocaine ring and did not deserve a downward departure.

■ Whether he accepted responsibility for his actions is a matter best weighed by the trial judge who heard all the evidence and post-trial proceedings. Clearly, the experienced trial judge did not abuse his discretion in refusing to give Haag a reduction for acceptance of responsibility. His decision finds support in the record.

■ Last, Haag claims that the misdemeanor convictions for assault and petty theft should have been disregarded. Appellant is incorrect. Misdemeanors count unless similar or the same as those enunciated in Section 4A1.2(c)(1) and (2) which are excludable. Assault and theft are not listed and neither are similar offenses.

■ However, his claim should not be considered as it is not appealable. These misdemeanor convictions raised his criminal history from a Category II to III, with a guideline range of 97 to 121 months. Category II has a guideline range of 87 to 108 months. The sentence of 100 months was within both guideline ranges and was permissible even if Haag's contention with respect to the misdemeanors were valid. It was therefore not appealable. *Cf. United States v. Bermingham,* 855 F.2d 925, 931 (2d Cir.1988) (not appealable if sentence is unaffected by selection of applicable guideline range).

## II. MICHAEL MOIT

### A. *Sufficiency of the Evidence*

■ There is strong evidence linking Michael Moit with this drug conspiracy. Frank Bennett, who was acting as an undercover informant for the FBI, testified that after a meeting with Giuffrida and Salsman on November 17, 1988, when cocaine was delivered to Salsman by Giuffrida, Bennett and Salsman went to Mike Moit's house. Bennett waited outside in the truck, but he observed Salsman meet Moit in the garage and then enter Moit's house with the package of cocaine he had received from Giuffrida. Thirty to forty-five minutes later Salsman returned to the truck "with a baggie, a large baggie, with a lot of little baggies inside of it, stuffed in the coat of his jacket." [sic] He told Bennett it was cocaine. (Moit App. 20–26).

Salsman told Bennett that the purpose of going to Moit's house was to break up the cocaine and that Moit had a scale. According to Salsman, Moit always got his cut when they broke up the cocaine and on this occasion he received six ounces. (Moit App. 32).

This same procedure was repeated on December 10, 1988. A kilo of cocaine was delivered by Giuffrida to Salsman. Salsman, Bennett and a man named Ron Martin went to Moit's house. Bennett and Martin stayed in the car. Again Salsman returned with "a large baggie with a bunch of little white packages in it." Salsman told Bennett later that Moit had received eight ounces of the cocaine. (Moit App. 34–39).

On another occasion Salsman received a package of cocaine from a man named

Blaze. Giuffrida was present. Salsman and Bennett again went to Moit's house to break up the cocaine. On this occasion Bennett went into Moit's house, where the kilo of cocaine was broken up and weighed. Moit measured out the cocaine and explained the operation of the scale. Moit kept a packet of the cocaine or six ounces. (Moit App. 42–45).

The tape of the January 19, 1989 conversation between Bennett, Salsman and Moit further demonstrates Moit's deep involvement in this conspiracy. Moit expressed great displeasure at a competitor in Wright City, Missouri who was undercutting him in price. He also complained about a customer who was a theft victim and therefore unable to pay him. (Tr.Vol. 11:74; Gov.Ex. 9A), (composite tape) Ex. 9 (composite transcript). Moit also talked about trading cocaine for work on his truck, which was corroborated by another witness and a document (Tr.Vol. II:7–13; Gov.Ex. 29).

A simple recital of the above testimony demonstrates the lack of merit in Moit's contention that he was entitled to a judgment of acquittal for insufficiency of the evidence to support a conviction on the conspiracy charge (Count I).

B. *The Testimony of Bennett that Haag had Committed Arson*

This testimony of Bennett was thoroughly discussed, *supra*, since Haag relied on it as one of his principal points for reversal. While there may be some slight merit in Haag's argument, there is none in Moit's contention. Moit's name is never mentioned in this testimony (Moit App. 54–59). He did not object to the testimony or join Haag in asking for a mistrial. For these reasons and those stated, *supra*, in connection with Haag's appeal, we summarily reject Moit's argument on this point.

C. *Failure to Instruct on Single v. Multiple Conspiracy.*

Moit claims that the court erred in failing to instruct the jury on multiple conspiracies as the evidence was insufficient to show an overall conspiratorial agreement between Moit and the other conspirators to possess and distribute cocaine. We disagree with Moit's interpretation. We find abundant evidence in the record to support a single overall conspiracy. The involvement of a number of separate transactions does not establish the existence of separate conspiracies. *United States v. Spector,* 793 F.2d at 935–36. "The existence of a single agreement can be inferred if the evidence revealed that the alleged participants shared 'a common aim or purpose' and 'mutual dependence and assistance existed.'" *United States v. De Luna,* 763 F.2d at 918, *quoting United States v. Jackson,* 696 F.2d 578, 582–83 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). With respect to single versus multiple conspiracies, this court has set forth the following guidelines:

> The general test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy. A conspirator need not know all of the other conspirators or be aware of all the details of the conspiracy, so long as the evidence is sufficient to show knowing contribution to the furtherance of the conspiracy.

*United States v. Massa,* 740 F.2d 629, 636 (8th Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). In our opinion the evidence here strongly supports a single overall conspiracy and not multiple conspiracies under the standard delineated above.

Furthermore, we find no indication in the addendum of Appellant Moit or the transcript that such an instruction was requested by Moit. If such an instruction was offered, nothing in the record is called to our attention where counsel gave the court explicit reason why the proffered instruction should have been given, as required by *United States v. Hecht,* 705 F.2d 976, 978 (8th Cir.1983). In fact Moit's counsel in response to the court's statement that he would "now entertain objections from the parties as to the failure of the court to give tendered instructions," replied, "I have no objections." (Tr. VI:16–17). Even if such an instruction had been offered, we hold

that the court would not have erred in refusing it.

## III. STEVEN CARL McGIRT

### A. *Sufficiency of the Evidence to Sustain Travel Act Conviction*

██ McGirt does not attack the sufficiency of the evidence to sustain his conviction on the conspiracy count (Count I). He argues that the evidence is insufficient on Count III, charging a violation of Title 18 U.S.C. § 1952, the Travel Act. This argument lacks merit. Salsman and Haag went to Los Angeles to buy cocaine, accompanied by a man identified as "Cedric" who was supposed to establish the California source for the drug. When "Cedric" was unsuccessful in making a connection, Haag called McGirt and persuaded him to fly to Los Angeles because Haag knew that McGirt had connections with a cocaine source in Los Angeles. (Tr. II:109–113). Salsman needed a large amount of the drug to continue the large-scale operation in the St. Louis area. Salsman was about ready to abandon the enterprise. McGirt's intervention with appellant Meriwether resulted in Salsman and Haag obtaining the requisite supply of cocaine. (Tr. 107–125). Only then was success of the project assured and only then could the drug enterprise continue to operate on its accustomed large scale.

McGirt's travel clearly came within the ambit of Title 18 U.S.C. § 1952(a). Without a doubt he traveled in interstate commerce to "promote ... or facilitate the promotion ... of an unlawful activity," which is defined in the act as "any business enterprise ... involving ... narcotics or controlled substances." McGirt not only "promoted" the operation of the drug ring, but also saved it from suspending operations because of the lack of a supply.

### B. *The Admissibility of Statements about McGirt in the Audio and Video Tapes of February 15, 1989*

██ When Bennett returned from California with the cocaine, he obtained a room at the Henry VIII Inn and set up audio and video coverage. He then arranged to meet Haag, Salsman and Giuffrida. Haag came first and then the others. McGirt's part in the activities in Los Angeles was mentioned along with future plans of the group. McGirt contends that these tapes were inadmissible. Some of the statements were very incriminating, such as Haag's statement, "Steve McGirt wants to work again." (Gov.Ex. 9, p. 8). There is also a discussion of McGirt's activities in Los Angeles and speculation as to whether he skimmed money in the deal.

Declarations on the tape were clearly "in furtherance of the conspiracy," as required by 801(d)(2)(E). The requirement for admissibility has been construed broadly. *United States v. Lewis,* 759 F.2d 1316, 1340 (8th Cir.1985). "We have previously found that statements of explanation which reveal the progress of the conspiracy are made in furtherance of it." *Id.* at 1340, citing *United States v. Massa,* 740 F.2d 629, 638 (8th Cir.1984), *United States v. Handy,* 668 F.2d 407, 408 (8th Cir.1982) and *United States v. Bentley,* 706 F.2d 1498, 1506 (8th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984).

██ Statements of co-conspirators are admissible if the government demonstrates (1) that a conspiracy existed, (2) that the defendant and declarant were members of the conspiracy, and (3) that the declarations were made during the course of and in furtherance of the conspiracy. *United States v. Bell,* 573 F.2d 1040, 1043 (8th Cir.1978). We find that all three conditions were met by the Government and the tape was properly received in evidence.

Fed.R.Evid. 104(a) requires the district court to apply a preponderance of the evidence test in assessing the admissibility of evidence. *Bourjaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987). Here the evidence decidedly preponderated in favor of the admissibility of the tapes detailing the meeting of the conspirators to distribute the cocaine obtained in California. In making its determination as to the admissibility of the co-conspirators' statements, the court

may consider any relevant evidence, including the statements sought to be admitted. *Bourjaily v. United States, supra* at 176–79, 107 S.Ct. at 2779–81; *United States v. Meeks*, 857 F.2d 1201, 1203 (8th Cir.1988). The trial court did not commit error in permitting the introduction of the tapes.

## IV. MICKIE MERIWETHER

### A. *Admissibility of the Tapes on the February 15, 1989 Meeting*

Appellant Meriwether advances the same argument as McGirt concerning the tapes of conversations of the co-conspirators in Bennett's room at the Henry VIII Inn on February 15, 1989. There was an allusion to Meriwether as the source of the cocaine obtained in Los Angeles. Meriwether attacks admission of the tapes on the same basis as does McGirt. He contends that the statements were not made "in furtherance of the conspiracy." We disagree for the reason stated, *supra*, in denying the identical contention by appellant McGirt.

### B. *Evidence of Marijuana Seized in Meriwether's Apartment*

 On February 15, 1989, Meriwether was arrested and a search warrant was executed on his home at 5511 Cherry Street, Long Beach, California (Tr. I:94). The following items were seized: (1) a triple beam scale, (2) a Friden electric scale, (3) a piece of Marriott Hotel note paper with Frank Bennett's name and Room 2169 written on it, (4) another paper with "Steve" and the number 2167 on it (this was the number of the room occupied by Steve McGirt at the Marriott Hotel), (5) an address book containing "Steve" and a telephone number, (6) several ziplock plastic bags, (7) a sifter, (8) a bag of dextrose (a diluent for cocaine), (9) $1300 in currency, and (10) a small quantity of marijuana.

Meriwether does not object to the other items but contends that admission into evidence of the marijuana seizure was prejudicial error. All these exhibits, particularly if they are associated with the marijuana, can be construed as narcotic paraphernalia and indicia of drug dealings. It is true that Meriwether was charged with a conspiracy

to distribute cocaine and that there is substantial evidence that he delivered three kilograms of cocaine to Bennett. The fact that marijuana alone was found in his house does not make the presence of that particular drug irrelevant and inadmissible, particularly when found with the other items. *Llach v. United States*, 739 F.2d 1322, 1327 (8th Cir.1984) (previous importation and distribution of methaqualone and marijuana held proper in cocaine prosecution); *United States v. Vitale*, 728 F.2d 1090, 1092 (8th Cir.1984) (prior marijuana sale and Uzzi sub-machine gun held admissible in cocaine prosecution); *United States v. Kadouh*, 768 F.2d 20, 21–22 (1st Cir.1985) (cocaine use held admissible in heroin prosecution).

### C. *The Alleged Batson Violation*

After the challenges for cause, six black jurors were left on the panel. The Government struck three by the exercise of its peremptory challenges. Meriwether raised a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) challenge on the ground that fifty percent of the blacks had been peremptorily removed. The trial judge held that a prima facie case had been made by Meriwether, a black man. The Government was invited to state its reasons for the strike.

 As to Ms. Darlene Dougherty, the Government stated that she said nothing during voir dire, it did not like her background and youthful age, and generally preferred men to women on narcotics cases. (Tr. Voir Dire:122–23). This does not show a *Batson, supra,* violation. *United States v. Nicholson*, 885 F.2d 481, 482–83 (8th Cir.1989), *United States v. Wilson*, 867 F.2d 486 (8th Cir.1989). *United States v. Young–Bey*, 893 F.2d 178, 179–80 (8th Cir.1990), *United States v. Hughes*, 880 F.2d 101, 103 (8th Cir.1989), remanded for additional hearing and *aff'd*, 911 F.2d 113 (8th Cir.1990).

 The other two strikes by the Government were also females. (Tr. Voir Dire:123). Both had family members with drug problems. The Government stated

that Mrs. Thompson appeared bored and disinterested. Her demeanor and dress did not impress the Government attorney. Mrs. Thompson also had some drug problems in her family life. (Tr. Voir Dire:123–24). The Government struck Miss Scott mainly due to her niece's association with cocaine (Tr. Voir Dire:123–24). Since Ms. Thompson did not know the nature of the jury case (criminal or civil) on which she had previously served, the Government felt she would not be able to clearly follow this evidence (Tr. Voir Dire:124). She was also slow and reluctant to admit the drug situation in her family (Tr. Voir Dire:129). The trial court determined that the Government's peremptory strikes were race-neutral and *Batson, supra,* was not violated. We hold that the court did not abuse its discretion. *Batson, supra* 476 U.S. at p. 98, 106 S.Ct. at p. 1724; *United States v. Fuller,* 887 F.2d 144, 146 (8th Cir.1989); *United States v. Ross,* 872 F.2d 249, 250 (8th Cir.1989); *United States v. Davis,* 871 F.2d 71, 73 (8th Cir.1989).

## V. CLAYTON LEE HOELSCHER

### A. *Sufficiency of the Evidence*

■ Appellant Hoelscher attacks the sufficiency of the evidence to sustain his conviction of conspiracy under Count I of the indictment. He argues that his motion for a judgment of acquittal should have been sustained. In the alternative he asks for a new trial.

If the jury believed the Government's informant and chief witness, Frank Bennett, which it had a right to do, there was strong evidence that Hoelscher was a significant member of the drug conspiracy. There is independent corroboration of Bennett's testimony. Bennett testified that on November 7, 1989, as detailed, *supra,* Giuffrida gave Salsman a kilo of cocaine, which was broken up and delivered to several individuals, including Hoelscher. The next day Salsman and Bennett met with Hoelscher at Blondie's—Hoelscher's bar in Troy, Missouri, which at that time was under construction (Tr. II:46). Salsman put twenty ounces of cocaine underneath the seat in Hoelscher's car (Tr. II:47). At the

time this was done, Hoelscher was inside the restaurant, but they went back inside and met with Hoelscher alone and Salsman told him that the cocaine had been placed underneath the front seat of the driver's side. Hoelscher responded, "Okay." (Tr. II:48).

On November 21, 1988, Bennett and Salsman again visited Hoelscher at which time the latter gave Salsman $5,000 enclosed in money wrappers (Tr. II:50). Hoelscher admitted that this transaction had occurred but claimed it was a loan repayment (Tr. V:177). Salsman told Bennett that he had received $4,500 from Hoelscher at the latter's house on December 15, 1988 (Tr. II:61). Hoelscher acknowledged this payment also but claimed it, too, was repayment for a loan (Tr. V:177). He admitted the money had been owed to Salsman for a year and a half (Tr V:177).

The January 30, 1989 tape wherein Bennett recorded a conversation between Salsman and Hoelscher is damaging to Hoelscher. This tape demonstrates Hoelscher's close association with Salsman and others involved in the conspiracy. In it Hoelscher suggested to Salsman that he had information about a source in Columbia by the name of "Rodney." (Supp.Jt. App. of Hoelscher, Haag and McGirt, p. 22). They discussed price and quantity, and Hoelscher suggested that if this source worked out, "You don't have to leave the state either." (*Id.* at 22). Later on Hoelscher said, "At least you wouldn't have to go nowhere ... he might even front you some ... he must be sitting on a shit load cause he wanted to talk to me right then." (*Id.* at 23). Later on Hoelscher said, "I ain't driving up there for ten ounces" *Id.* at 23). Later it is clear that when they talked about the out-of-state travel, they were referring to the proposed trip to California (*Id.* at 29).

Another tape of January 19, 1989, in which Bennett recorded a conversation between Salsman, Moit and himself, disclosed that Clay Hoelscher wanted twenty more ounces of cocaine from Salsman. Hoelscher told Salsman he had money in the bank

to pay for it and he was told to go get it (Gov.Ex. 9–J).

From the above evidence, it is rather obvious that Hoelscher was a middleman in the operation of the drug ring. He obtained rather large quantities of cocaine from Salsman and made distribution to his user-customers. The depth of Hoelscher's involvement and his status as a big-time dealer is shown by his statement that he would not go to Columbia for ten ounces. It is evident that the Government made out a strong factual case against Hoelscher by both direct and circumstantial evidence. The legal principles involved in establishing a conspiracy are set forth in the discussion of Haag's attack on the sufficiency of the evidence, *supra*.

### B. *Refusal of Court to Give Hoelscher's Instruction No. 1*

■ Hoelscher offered as his Instruction No. 1 the following: "If a party offers weaker and less satisfactory evidence when stronger and more satisfactory evidence could have been produced, you may view the evidence offered with suspicion." He contends that this instruction should have been given because the Government's principal witness against Hoelscher was Bennett, when Salsman could have been used.

The propriety of giving such an instruction is clearly within the discretion of the trial court. *United States v. Williams*, 481 F.2d 735, 738 (8th Cir.1973), *cert. denied*, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973). "Absent unusual circumstances such as knowingly concealing evidence favorable to a defendant, the government has wide discretion with respect to the witness to be called to prove its case." *Id.* at 738.

In this case the Government had every reason to rely on Bennett rather than Salsman. Bennett had no prior record and was not a drug user. No criminal charges were dismissed in return for his cooperation. (Tr. II:30). Examination of the transcript of his testimony indicates that Bennett made an excellent witness for the Government. He had a good memory for detail and effectively withstood vigorous cross-

examination. Salsman on the other hand was a co-conspirator with perhaps the principal role in this conspiracy. As a witness he was vulnerable from many aspects. Salsman had pled guilty and could have been called by any of the appellants. They chose not to do so. It is hardly appropriate for one of the appellants to criticize the Government's tactics in failing to call him. The trial court did not err in refusing this instruction.

### C. *The Juror's Alleged Misconduct*

■ Hoelscher claims that he should receive a new trial because one of the jurors, Wayne Boyd, failed to disclose during voir dire that he knew Hoelscher. All of the defendants stood when the question of whether any member of the panel knew any of them was asked. Boyd did not indicate that he knew Hoelscher. It is of course possible that Boyd did not know him or that he had no recollection of Hoelscher. This matter is raised in the motion for new trial and consists only of Hoelscher's bare allegation that they had a past association and the allegation that Boyd recognized Hoelscher's mother. This testimony in the case was concluded on August 30. The jury began its deliberation late on August 31, but was permitted to adjourn after only about an hour's deliberation. In his motion for a new trial, Hoelscher stated that it was not until August 30, at the end of an eight-day trial that he "recognized juror number four (4), Wayne Boyd as an individual that he had known for a very long time from the Troy, Missouri area. In fact, Defendant Clayton Hoelscher recalled that as recently as a couple of years prior to the trial of this matter he had bowled in a league against juror number four (4), Wayne Boyd, on numerous occasions."

One wonders why, if Hoelscher and Boyd had such a frequent and recent association, Hoelscher did not recognize Boyd at the voir dire. At that time his attorney could have questioned Boyd about possible bias. At no time did Hoelscher call the purported acquaintanceship to the attention of the court. The strong suspicion arises that Hoelscher withheld the information from

the court, gambling on the possibility that Boyd would be a favorable juror to him.

The unsupported allegation in apellant's motion for new trial comes far too late. We decline to order a new trial or to furnish an opportunity at this late date to voir dire Boyd, as requested by appellant. We hold that appellant waived his right to obtain such relief.

In *United States v. Dean,* 667 F.2d 729 (8th Cir.1982) (en banc) a juror during the trial made an out-of-court statement that the defendant was guilty and would be convicted. This information was transmitted to defendant's attorney by an anonymous note while the trial was in progress. However, counsel did not apprise the trial judge of this development. After an adverse verdict, defense counsel made a posttrial motion for a new trial based on the juror's statement. At the hearing on the motion it developed that the juror had actually made the statement. The trial judge declined to order a new trial and was affirmed by this court. The district judge found that defense counsel knew about the juror's misconduct from the note, but neither he nor his client, who knew the informant's identity, brought it to the attention of the court or sought any relief, and there were two alternate jurors on duty at all times. In this case there were also two alternates. (Tr. Voir Dire:114). This court adhered to the general rule that jury misconduct known to defendant or his counsel and not called to the attention of the court before the return of the verdict, cannot be a ground for a new trial. *United States v. Dean, supra* at 733. The court then cited two cases from this circuit following this general rule. It quoted the following excerpt from *United States v. Nance,* 502 F.2d 615, 621 (8th Cir.1974): " 'A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains.' " 502 F.2d at 621, *quoting McNeely v. United States,* 353 F.2d 913, 917 (8th Cir.1965). In closing Judge Henley wrote for a majority of the full court:

> In sum, we decline to make a distinction between possible prejudice and actual prejudice when addressing the issue of

waiver. We conclude that our line of decisions, culminating in *United States v. Sorenson,* 611 F.2d 701, 702 (8th Cir. 1979), is controlling, and that appellant, by not bringing the question of juror misconduct to the attention of the trial court before the verdict was returned, thereby waived his right to a new trial.

*United States v. Dean, supra* at 734.

### D. Allegation of Error

 Hoelscher claims that he should have had a downward departure under the Sentencing Guidelines because he had a minimal role in the conspiracy. We agree with the trial judge that Hoelscher's role in this conspiracy was not minimal. He was a major distributor for this drug ring. He busied himself with trying to find additional supply sources for Salsman. The sentencing court's findings must be accepted unless they are clearly erroneous. *United States v. Goebel,* 898 F.2d 675 (8th Cir. 1990). The sentence imposed in this case was proper under the guidelines.

Hoelscher joins Haag in claiming error for failure to disclose the Internal Revenue Service moratorium and the $1500 payment to Bennett. This contention was fully discussed, *supra* in Section I(D) of this opinion.

## VI. ALFRED GIUFFRIDA

### A. *Withdrawal of Guilty Plea*

 Appellant pled guilty to Count VI of the indictment. Count I was then dismissed. The sentencing transcript showed that the trial judge fully explained appellant's rights to him and the implications of his guilty plea under both the statute and the guidelines. Count VI charged that on February 15, 1989 appellant had distributed 4.4 pounds of cocaine. Appellant claims that when he entered this plea, it was his understanding that he could only be held responsible for the amount of cocaine alleged in Count VI. In other words, the guideline range would be restricted to a computation based on 4.4 pounds or 2 kilograms of cocaine.

Judge Limbaugh's explanation refutes such a contention:

Now when the information on you is inserted and the formula comes out with an answer, the range may be different. Instead of ten years, it could be fifteen years to life, or it could be ten years to thirty years, or ten years to twenty-five years, or ten years to fifty years.

. . . .

So if the maximum happens to be 25 years, and I elect to give you the maximum, then I couldn't give you more than twenty-five years, even though the statute provides for life.

. . . .

Mr. Gilmore may have tried to estimate it for you; Mr. Reap could even try it, and I could even try it, but we may not be right. If Mr. Gilmore has given you an estimate, and he is doing this for your benefit, so you can attempt to know where you are in this, but he may be wrong. So I want you to know, if he has given you any kind of estimate at all, it's only an estimate. And if anyone has told you that these are the specific Guidelines, that I will be following with respect to the range of punishment, then it's only an estimate only; do you understand that, sir?

The Defendant: "Yes, your honor."

(Tr. 18–19).

At the trial substantial evidence was adduced that Giuffrida was involved in the distribution of much more than two kilograms of cocaine. Distribution was established, placing him in the guideline range for 5 to 14.9 kilograms of cocaine. This range used by Judge Limbaugh from the Guidelines for sentencing Giuffrida was entirely permissible. *See United States v. Fernandez,* 877 F.2d 1138, 1140–43 (2d Cir. 1989) where there was a course of conduct and common scheme for distribution of 25 kilograms of cocaine. This amount was used to determine the Guideline range and not the five kilograms recited in the single count to which defendant pled guilty. Defendant claimed that he misunderstood such an application of the guidelines and sought to withdraw his guilty plea. His

motion was denied. *See also United States v. Sweeney,* 878 F.2d 68, 69–70 (2d Cir.1989). Appellant in the case before us was told the range of punishment and further told that the Guidelines applied. We apprehend no basis for setting aside appellant's plea of guilty.

B. *Alleged Errors in Guideline Computation*

■ Concomitant with his argument concerning withdrawal of his guilty plea, appellant contends that only the two kilograms in the count to which he pled guilty should be considered in computing the Guideline range. The evidence of the trial showed that appellant was involved in the distribution of five and perhaps six kilograms of cocaine. Contrary to appellant's contention, the additional kilograms of cocaine were proper components of the guideline computation. All relevant conduct can be used to arrive at the guidelines range under Sections 1B1.3 and 3D1.2 of the Guidelines. *United States v. Allen,* 886 F.2d 143 (8th Cir.1989); *United States v. Ehret,* 885 F.2d 441, 444–45 (8th Cir.1989); *United States v. Mann,* 877 F.2d 688, 689–90 (8th Cir.1989).

Giuffrida's other exceptions to the Guidelines computation are without merit. The record is devoid of any evidence that he acted under duress from Salsman. Appellant gave Salsman $45,000 to buy cocaine in California and came voluntarily on February 15, 1989 to the Henry VIII Inn to pick up his share of the purchase. He delivered cocaine with regularity to Salsman each month in late 1988 and early 1989. His actions are hardly those of an individual under duress.

■ Giuffrida complains of the upward adjustment in the Guidelines because he was an organizer or leader. We agree with the trial judge that this man was a leader and organizer of the drug ring under Guidelines Section 3B1.1. Such a determination is not clearly erroneous, which is the proper standard for review. *United States v. Holland,* 884 F.2d 354, 358 (8th Cir. 1989).

The judgments of conviction are affirmed.