16 F.3d 412
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
Douglas Thomas CLAY, Jr., Defendant-Appellee.
 No. 935153.
 United States Court of Appeals, Fourth Circuit.
 Dec. 10, 1993.
Jan. 31, 1994.
 
 Appeal from the United States District Court for the Western District of Virginia, at Danville, Jackson L. Kiser, Chief District Judge. (CR-92-86-D)
 Ray B. Fitzgerald, Jr., Assist. U.S. Atty., Roanoke, Virginia, for Appellant.
 Grady W. Donaldson, Jr., Twery, Schenkel & Donaldson, P.C., Lynchburg, Virginia, for Appellee.
 E. Montgomery Tucker, U.S. Atty., Roanoke, Virginia, for Appellant.
 W.D.Va.
 Reversed and Remanded.
 
 
 1
 Before PHILLIPS and HAMILTON, Circuit Judges, and NORTON, U.S. District Judge for the District of South Carolina, sitting by designation.
 
 OPINION
 PER CURIAM
 
 2
 The government appeals the district court's grant of Douglas Clay's motion for judgment of acquittal, Fed. R. Crim P. 29, after the jury convicted him of conspiracy to possess with intent to distribute and to distribute cocaine. 21 U.S.C. Secs. 841(a)(1) and 846. Concluding that a rational trier of fact could have found Clay guilty beyond a reasonable doubt, we reverse and remand with instructions to reinstate the jury's verdict.
 
 
 3
 * As required, we state the facts in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 317-19 (1979); United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). Beginning in 1987 and continuing until July 1992, Steve Manley Powell managed a cocaine conspiracy in and around Danville, Virginia. In 1987, Powell began to drive to his drug sources in Florida to obtain cocaine for, among others, Boyd Adkerson. As Powell's clientele increased, Powell employed drug couriers to acquire cocaine approximately once a month from his sources in Florida. These couriers travelled to Florida, acquired varying amounts of cocaine, and returned the cocaine to Powell at his farm in Halifax, Virginia, the hub of the conspiracy. The cocaine was then stored in a safe at the farm. Thereafter, the cocaine was cut into smaller amounts for distribution.
 
 
 4
 There is abundant evidence in the record that Thomas Pritchett, James Waller, and William Durham made frequent trips to Florida to acquire cocaine for Powell.[1] However, the evidence is not abundant, and in fact contradictory, on whether Clay made any cocaine runs for Powell. Pritchett testified that Powell told him that Clay and Durham assumed his role of driving to acquire cocaine after Pritchett stopped making drug runs for Powell. Powell denied making this statement. Pritchett also testified that in late 1991 Clay said that he (Clay) assumed Pritchett's duties on the farm, which included working on the farm and driving for cocaine.[2] During the conspiracy, some members of the conspiracy lived and worked on the farm. For example, Waller and Durham lived in a house on the farm for approximately one year.[3] In addition, Waller, Durham, and Clay worked on the farm performing various duties, including farming chores and electrical and plumbing work.
 
 
 5
 Powell acquired and distributed cocaine "on the front," in other words on credit or consignment. After the sales of cocaine in Virginia were consummated, part of the proceeds were wired to Powell's sources in Florida through Western Union. Powell utilized Western Union money transfers to pay his Florida sources for the fronted cocaine and for the travelling expenses of his couriers. The Western Union money transfers that were introduced into evidence clearly implicated Waller and Durham in the conspiracy. However, there was no evidence that Clay was ever involved in any money transfers through Western Union.
 
 
 6
 Beginning in February 1992, Clay purchased cocaine from Powell on a regular basis. Powell testified that Clay purchased approximately one ounce of cocaine every couple of weeks from February 1992 until Powell's arrest in July 1992. The cost of these one ounce transactions was $1,000 each. Powell also testified these transactions were on the front. The total amount of cocaine distributed to Clay was approximately eight ounces.[4] There was no evidence offered as to what Clay did with the cocaine after it was distributed to him, except for the testimony of Kenneth Daniel who testified that Clay would take him out on his boat "pretty regular[ly] during racing season," (J.A. 271), where the two of them would use some of Clay's cocaine. Finally, the record indicates that Clay did not maintain a steady job, was seen, at least on one occasion, possessing a large amount of cash, and hid a large sum of money in a light fixture in his home.
 
 
 7
 On October 23, 1992, a grand jury in the Western District of Virginia returned a twenty-five count indictment charging Clay and eighteen others with numerous drug trafficking offenses. Count one, which is the subject of this appeal, charged, among others, Powell, Waller, Durham, and Clay with conspiracy to possess with intent to distribute and to distribute cocaine. 21 U.S.C.Secs. 841(a)(1) and 846. Prior to trial, Powell pleaded guilty and cooperated with the government. Clay was tried along with three others, Waller, Durham, and Adkerson.
 
 
 8
 The chief witnesses for the government were Powell and Pritchett. As to Clay, the government also introduced evidence pursuant to Fed.R.Evid. 404(b). Bill Becica testified that, in March 1990, he travelled to Florida to purchase cocaine for the leader of another drug conspiracy, Glen Francis, and brought back one kilogram of cocaine for Clay. Clay paid Becica $24,000 for the cocaine. Becica also testified that Clay fronted him two ounces of cocaine "a couple of weeks or months" later. (J.A. 226).
 
 
 9
 There was also evidence presented that, in January 1990, Clay purchased two lake front lots on Lake Hyco for $18,000. Clay wanted Barbara Daniel, the seller of the property, to retain title to the property and finance the sale. Daniel refused to retain title to the property, but financed the transaction. Clay eventually got his girlfriend's sister, Elizabeth Preston Barksdale, to take title to the property in her name. Clay made payments on the property in large, irregular payments, and completely stopped making payments a few weeks after Becica was arrested.[5]
 
 
 10
 At the close of the government's case, Clay moved for judgment of acquittal as to count one. Fed.R.Crim.P. 29. The district court denied the motion. At the conclusion of the trial, the jury convicted Clay of the conspiracy count.[6] After the jury returned its verdict, Clay renewed his motion for judgment of acquittal. Relying on United States v. Townsend, 924 F.2d 1385 (7th Cir.1991), the district court granted Clay's motion. The government appeals.
 
 II
 
 11
 The government contends that the district court erred in granting Clay's motion for judgment of acquittal, Fed. R.Crim. Proc. 29, because there was evidence in the record from which a rational trier of fact could have found Clay guilty of conspiracy beyond a reasonable doubt. Clay responds by asserting that there was insufficient evidence that he joined a conspiracy. Clay does not dispute, nor could he, that there was a conspiracy headed by Powell; rather Clay contends that, although he associated with members of the conspiracy, the evidence demonstrates that he and Powell were, at best, in a buyer-seller relationship and, therefore, the evidence was insufficient to prove that he was a participant in the conspiracy to distribute cocaine.
 
 
 12
 The issue raised in this appeal is a familiar one:"whether, viewing the evidence in a light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." Tresvant, 677 F.2d at 1021." Where there are conflicts in the testimony, it is for the jury and not the appellate court to weigh the evidence and judge the credibility of the witnesses." Id.
 
 
 13
 It is well settled that in order to prove a conspiracy, the government must prove: "(1) an agreement between two or more persons (not including government agents), (2) to commit in concert an unlawful act." United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). In assessing whether the government has established the necessary agreement, we look to the totality of the circumstances. United States v. Bell, 954 F.2d 232, 236 (4th Cir.), cert. denied, 61 U.S.L.W. 3260 (1992). The government need not show that the defendant knew all the conspirators, had knowledge of all the details of the conspiracy, or that he had a major role in the conspiracy. United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992). Nor is it incumbent upon the government to prove the commission of an overt act in furtherance of the conspiracy. United States v. Mabry, 953 F.2d 127, 130 (4th Cir.1991), cert. denied, 112 S.Ct.1951 (1992). Because conspiracies are intrinsically secretive, the government may prove its case by circumstantial, as well as direct, evidence. Giunta, 925 F.2d at 764; United States v. Brown, 856 F.2d 710, 711-12 (4th Cir.1988). "More than mere association with bad people who are committing crimes is required for a conspiracy conviction." Bell, 954 F.2d at 237. Once the government establishes the existence of a conspiracy, "the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." Brooks, 957 F.2d at 1147. Once a defendant joins a conspiracy, he is liable for all past and future acts of his conspirators. United States v. Barksdale-Contreras, 972 F.2d 111, 114 (5th Cir.1992), cert. denied, 113 S.Ct. 1060 (1993); United States v. Rea, 958 F.2d 1206, 1214 (2d Cir.1992); United States v. Hoelscher, 914 F.2d 1527, 1534 (8th Cir.1990), cert. denied, 111 S.Ct. 971 (1991).
 
 
 14
 To support his argument, Clay relies on Townsend. Townsend takes the view that evidence of a mere buyer-seller relationship, without more, cannot support a finding of the existence of a conspiracy. Numerous circuits are in accord with this proposition. See, e.g., United States v. Beasley, 2 F.3d 1551, 1560 (11th Cir.1993); United States v. Garcia-Rosa, 876 F.2d 209, 223 (1st Cir.1989), cert. denied, 110 S.Ct. 742 (1990); United States v. Morris, 836 F.2d 1371, 1374 (D.C.Cir.1988); United States v. Jones, 816 F.2d 1483, 1487 (10th Cir.1987); United States v. Prieskorn, 658 F.2d 631, 633 (8th Cir.1981). At least one circuit has neither fully embraced nor rejected the proposition. See United States v. Houser, 929 F.2d 1369, 1372 (9th Cir.1990) ("We have not accepted or rejected the rule that a single buyer-seller transaction is not a conspiracy."). In our circuit, we have not expressly embraced the proposition, but rather have tacitly approved it. See United States v. Mills, 995 F.2d 480, 485 (4th Cir.1993) ("We take it for granted that there may be instances where one is merely a buyer or seller, but not a conspirator.").[7] Because the question of when a buyer or seller becomes a member of a conspiracy revolves around a plethora of circumstances, it is not prudent to belabor the intricacies of when a buyer or seller transforms into a conspirator. Suffice it to say that we take it for granted, as we did in Mills, that there are instances in which a buyer or seller is not a conspirator. We also recognize, as we did in Mills, that evidence of a buyer-seller relationship is certainly probative"of whether a conspiratorial relationship exists." Id. at 485 n. 1. Ultimately, the resolution of whether a buyer or seller is a conspirator must be arrived at on a case-by-case basis.
 
 
 15
 In this case, we believe the evidence was sufficient to establish that Clay was a member of the conspiracy. Pritchett testified that Powell told him that Clay, along with Durham, assumed his driving duties after he stopped making cocaine runs for Powell. Pritchett also testified that in late 1991 Clay said that he (Clay) assumed Pritchett's duties on the farm, which included working on the farm and driving for cocaine. This evidence clearly supports the reasonable inference that Clay actively participated in the conspiracy. While Powell's testimony and other evidence in the record raises serious doubts concerning Pritchett's testimony, the question of credibility of witnesses is for the jury. It is not within our province to weigh the credibility of the witnesses. Tresvant, 677 F.2d at 1021.
 
 
 16
 The evidence of participation does not end there. Clay purchased substantial quantities of cocaine on numerous occasions over a six-month period. The regular purchases of cocaine certainly implies an enduring arrangement between Clay and the conspiracy. See United States v. Edwards, 945 F.2d 1387, 1397 (7th Cir.1991) (defendant's ongoing relationship with members of the conspiracy probative of his membership), cert. denied, 112 S.Ct. 1590 (1992). The size of the purchases also suggests that Clay was a member of the conspiracy rather than a mere purchaser or user of cocaine. Mills, 995 F.2d at 485 n. 1 ("buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators"). Clay was also seen, at least once, with a large quantity of cash, and hid money in a light fixture in his house. In addition, the cocaine supplied to Clay was on the front which implies that Clay had to sell some of the cocaine to pay Powell. This fact implies that Powell and Clay were joint venturers sharing in the profits of Clay's sales. See United States v. Dortch, 5 F.3d 1056, 1065 (7th Cir.1993) ("We have consistently held that evidence of'fronting' suggests the existence of a conspiracy because it appears both that the seller has a stake in the success of the buyer's activities and that a degree of cooperation and trust exists beyond that which results from a series of isolated and sporadic transactions.").
 
 
 17
 It is true that Clay proffers a somewhat plausible explanation that he was simply a buyer of cocaine, as opposed to a conspirator. Such an argument, however, misses the mark. The issue is whether "any rational trier of facts could have found the defendant guilty beyond a reasonable doubt," Tresvant, 677 F.2d at 1021, not whether the evidence is plausible with Clay's innocence. And the evidence, in this light, suggests membership in the conspiracy, rather than mere association. Stated differently, the cumulative effect of the evidence in this case constitutes sufficient evidence to support the jury's verdict that Clay was a participant in the conspiracy, rather than "an unwitting or uninvolved bystander." United States v. Brown, 956 F.2d 782, 787 (8th Cir.1992). Accordingly, the judgment of the district court is reversed and the case is remanded with instructions to reinstate the jury's verdict.
 
 REVERSED AND REMANDED WITH INSTRUCTIONS
 
 
 [1]
 William Durham was also known as"Billy." Clay was also known as "T.C."
 
 
 [2]
 Pritchett's testimony consisted in part of the following:
 Q. [After you left the farm], [w]ho was driving cars to get cocaine according to what Steve Powell told you?
 A. Billy and T.C....
 Q. Did Powell tell you how frequently Durham and T.C. were going south or how much cocaine they were bringing back?
 A. No, sir.
 Q. Was there ever a time when you had a conversation with T.C. himself?
 A. Briefly.
 Q. Where did that conversation take place, about cocaine trafficking?
 A. Ground Round.
 Q. Ground Round? ...
 A. Well, that's what it was. He just--We were setting [sic] there talking, and everybody was talking about going somewhere else, cause [sic] the Ground Round was full, and we was [sic] talking about the farm, and Steve said something or other, and then T.C. said well, he's [Clay's] the one that took my [Pritchett's] place down at the farm, my [Pritchett's] duties.
 Q. And what would that have included?
 A. Working on the farm and driving.
 Q. Driving for cocaine?
 A. Yeah.
 (J.A. 37-40).
 
 
 [3]
 In fact, Powell eventually installed a safe in this house for purposes of storing larger amounts of cocaine
 
 
 [4]
 Powell testified that one dosage unit of cocaine was the equivalent of one tenth of a gram and that there were twenty-eight grams in an ounce. Using Powell's figures, Clay received 280 dosage units of cocaine every couple of weeks for six months, or approximately twelve dosage units per day
 
 
 [5]
 Becica was arrested in June 1990
 
 
 [6]
 Clay was also charged with a money laundering count and a forfeiture count. The money laundering count was dismissed by the district court during the trial and the forfeiture count was nolle prosequi
 
 
 [7]
 Townsend goes one step further and implies that a buy-sell transaction, regardless of the quantity involved, is not probative of an agreement to join a drug conspiracy. Townsend, 924 F.2d at 1394. We have not favorably interpreted Townsend. For example, in Mills, while we took "for granted that there may be instances where one is merely a buyer or seller, but not a conspirator," Mills, 995 F.2d at 485, we noted that:
 evidence of a buy-sell transaction is at least relevant (i.e. probative) on the issue of whether a conspiratorial relationship exists. Moreover, we believe evidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators.
 Id. n. 1.