**UNITED STATES of America, Plaintiff,**

v.

**Thomas R. BENGIMINA, Charles C. Bengimina, and John J. Bengimina, Defendants.**

**No. 88–00064–01/03–CR–W–6.**

United States District Court, W.D. Missouri, W.D.

Nov. 7, 1988.

Michael Dittoe, Strike Force Atty., U.S. Dept. of Justice, Kansas City, Mo., for plaintiff.

Byron Fox, Kansas City, Mo., for Thomas R. Bengimina.

F.A. White, Jr., McFadin, White & Fincham, Kansas City, Mo., for Charles C. Bengimina.

Robert C. Welch, Paden, Welch, Martin, Independence, Mo., for John J. Bengimina.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Pending before the court are issues of restitution in connection with the future sentencing of three members of the Bengimina family. Defendants have engaged in servicing and at times owning cigarette vending machines and amusement devices such as video games that are widely scattered throughout the Kansas City area. The father (Thomas) and one son (Charles) have pleaded guilty before Chief Judge Wright to conspiring to conceal assets in bankruptcy in violation of 18 U.S.C. § 152. A younger son (John) has pleaded guilty to contempt of the bankruptcy court by removing a vending machine belonging to a bankrupt corporation, in violation of 18 U.S.C. § 402.

Thomas and Charles Bengimina have acknowledged participation in issuing and distributing one of four checks totalling $6,310, thereby taking assets of Bee Gee Management Company. The company was formerly operated by Charles and John, with direction or assistance from Thomas.

The management company, apparently a partnership, was named in an involuntary petition in bankruptcy filed January 26, 1987, which also named the corporate owner of the equipment, Comp–Tech Vending of St. Louis. The adjudication of bankruptcy occurred March 24, 1987, the same date as the checks were purportedly issued. Three of the four checks, totalling $2,310, were presented to banks on March 25. The two defendants have acknowledged responsibility for a $900 check payable to John and cashed on March 25. They further acknowledged knowing the transaction was fraudulent and against the law. Thomas instructed Charles that the check be issued.

Thomas and Charles Bengimina are also alleged to have been involved in removal of Comp–Tech vending machines and later solicitation of the location owners for a competing organization, Ben Gee Vending Company, formed by the brothers Charles and John immediately after the adjudication. The removal and solicitation issues were not covered at the change of plea, except on the charge pending against John.

The restitution claims were presented to the court in an all-day hearing on October 26, 1988. The Government contends that the Bengiminas effectively destroyed the going-concern value of Comp–Tech which could otherwise have been preserved through a temporary leasing arrangement with Vincent Gulotta, and that the good will could thereafter have been sold for a substantial sum exceeding $100,000. An array of legal issues is presented by this case and several will be here decided, in advance of sentencing, now scheduled for November 10, 1988. The initial sentencing date, October 21, 1988, was necessarily continued to permit the hearing on restitution. The parties have filed substantial briefing and this ruling has been abnormally expedited to permit reasonably prompt sentencing.

### I.

The first question to be resolved concerns John Bengimina, who pleaded guilty to a separate information charging removal of one vending machine from the Long-

branch Saloon on the Plaza in Kansas City. He is not charged with conspiracy. The Government nevertheless contends he is subject to a restitution order going considerably beyond the allegations filed pursuant to a plea agreement. Although there appears to be a division of authority, I conclude that current law in the Eighth Circuit requires that restitution order must be confined to the offense which is charged, and to which a plea has been entered.

■ This result was clearly required under previous federal law relating to restitution as a condition of probation. 18 U.S.C. § 3651 (repealed as of November 1, 1987). That statute specified that restitution be governed by the scope of "the offense for which conviction was had." More recent Eighth Circuit decisions similarly state that restitution is appropriate for a victim who has "suffered a loss as a result of the offense charged." *United States v. Kail*, 804 F.2d 441, 449 (8th Cir.1986); *United States v. Spars*, 848 F.2d 890, 891 (8th Cir.1988). While the Government cites no Eighth Circuit ruling authorizing a more expansive approach to restitution, it contends that rulings elsewhere should cause me to disregard current statements of law in this circuit as being inadvertent expressions failing to note a change in the statutes.

Some courts outside this circuit have indicated that restitution is now unconfined by the offense charged. *See, e.g., United States v. Hill*, 798 F.2d 402 (10th Cir.1986); *United States v. Allison*, 599 F.Supp. 958 (N.D.Ala.1985). While I consider myself bound by statements of law in such local rulings as *Kail* and *Spars*, my examination of the sections of the statute in question indicates there has been no such dramatic change in the scope of restitution orders as the Government asserts. Reading §§ 3663 and 3664 of 18 U.S.C. together, it seems clear that the offense for which conviction was had still controls restitution orders.

Restitution may be ordered in favor of any victim of "the offense" (18 U.S.C. § 3664), but "the" offense referred to is not otherwise defined in that section. The previous section provides that restitution may be ordered "when sentencing a defendant convicted of an offense...." 18 U.S.C. § 3663. Congressional omission of the phrase referring to "the offense for which conviction was had" seems to have been a cosmetic change, not a substantive one, when the two current sections are read together. I am aware of no legislative history tending to show that Congress intended to expand restitution beyond the framework established by the conviction.

■ This ruling does not mean that in a conspiracy case or other charge that there was a scheme to defraud or injure victims the Government is limited by the overt acts alleged, that victims need be named in an indictment or otherwise directly targeted by the offense before they are entitled to restitution, or that trial proof in the underlying criminal case cannot be later supplemented for purposes of restitution. Congress did intend liberal use of restitution where a scheme to defraud, for example, is alleged. *United States v. Pomazi*, 851 F.2d 244, 250 (9th Cir.1988). But where a defendant is simply charged with violating a court order by removal of one vending machine at one location and pleads guilty to that offense, the Government is not entitled to a restitution order dealing with all arguably related misconduct it can prove at a restitution hearing. Thus, the Government's evidence pertaining to the issuance of checks on another day, removal of other equipment from other locations, solicitation of customers later in this scenario, and generalized damage to the business of the owner of all the vending machines will not support a restitution order directed toward John Bengimina.

The hearing record indicates that the machines that were moved or removed have all been recovered. Their warehouse value is not, however, as great as their value on location and in operation. Defendants' witness, Nussenbaum, who is credited by the Government with considerable practical expertise, testified that a vending machine on location might be worth $450 more than in a warehouse (by way of illustration) and that the sales price of a substantial number

of vending machines might also be enhanced by using a formula based on up to 15 weeks of income. He testified convincingly, however, that cigarette vending machines are now believed to have a hazardous future, that he would not bid for a large quantity of such machines at their "going-concern" value, and that problems between location owners and equipment owners arising from mismanagement or financial distress would make it unlikely that full "going-concern" value would be offered by a prospective purchaser in any event. Under the circumstances the proof is inadequate for entry of a restitution order against John Bengimina exceeding $450, and even that sum has a thin evidentiary basis. It will, however, be used, under the preponderance of the evidence rule (18 U.S.C. § 3664(d)) in the absence of anything more convincing offered by either side.

## II.

The Government's principal objective in restitution is to obtain an order assessing Comp–Tech's "going-concern" value to the Bengiminas. The theory is that the Bengiminas "picked off" the best locations during the days immediately after adjudication and thereby made the lease or sale of the business impracticable. Special Agent Osborn of the FBI compiled records on gross sales at 245 cigarette vending machines at 146 locations and also testified to gross sales during the five months before adjudication at the most productive locations. The Government does not seek damages for loss of video game profitability because the records do not permit such a calcula-

tion. The Government's expert witness, David Brain, an accountant with a major firm, annualized the gross cigarette sales to $628,000, deducted various costs and assumed costs, concluded that there were $51,000 in net profits per year from cigarettes before taxes, and then capitalized earnings for four years to arrive at a going concern value of some $200,000. He concluded that since defendants had taken or destroyed 13 locations shortly after adjudication and thereafter finally took or destroyed 31 locations (38 according to defendants), they had rendered the business unsalable.[1] Seventeen percent of the gross revenues had been derived from the first 13 locations, but the record does not show what net revenues were lost, a matter affected by individual commissions or franchise fees paid to location owners. After deducting the value of inventory and machinery recovered by the trustee, Mr. Brain concluded that good will had been damaged in the amount of $102,000, and that additional costs attributable to the loss of the business pushed the claim to $121,000 damages.

The Government's final witness, Max Jevinsky, attorney for the trustee, testified to the history of the court orders and events on which damage was claimed. He also testified to various sales of other vending machine businesses which were claimed to be supportive of the conclusions by Mr. Brain.

Defendants' final witness, the operator of a vending and amusement company business in Springfield, Missouri, testified that in buying or selling such a business the most that would be paid for locations as

1. The record on this issue is inconclusive. There was persuasive evidence that the business volume was always too small to "stand alone" efficiently. No convincing evidence was offered that large sums would have been paid for good will by a prospective purchaser intending to struggle along independently. The Gulotta family, for example, is not shown to have been a prospective purchaser, willing to offer a major sum for good will. Financial information from the Probation Office shows the Ben Gee business, which purportedly acquired the prime locations served by Bee Gee Management, generally loses money during the summer, although net income in September exceeded $4,000.

John has a monthly "cash flow" of $400, and Charles draws about $600 monthly. If the bankrupt business were simply to be added to some larger entity, as seems most feasible, it is not convincing that the volume of 83% (available after the initial raid), or even 50%, would have been unattractive to a prospective purchaser. There appears to be a limited market for this sort of business, however. The evidence of other sales offered by the trustee's attorney went in too quickly to ascertain whether they were really comparable and involved "stand alone" operations, as seems probably necessary to a conclusion that the *entire* business loss was attributable to raiding by the Bengiminas.

such would be $100 to $150. He conceded that good will is a factor in such transactions but opined that a bankrupt business has little good will.

There was also a causation controversy, in that third parties "picked off" some 33 locations, according to defendants, and the damage they did to corporate good will is disregarded by the Government. On the sketchy record available, the third party intrusions could have been either independently fatal to the business or a necessary component of the failure. Apparently the business was not abandoned by Vincent Gulotta until the end of May. This suggests, although inconclusively, that the Bengimina raiding would not alone have been fatal.

The first legal issue is whether the court should have heard, and needs now to closely analyze, the Government's general claim that Thomas and Charles Bengimina should be charged with something over $100,000 in corporate good will of the bankrupt corporation. This requires consideration of a restriction in the restitution statute against assessing restitution in instances where "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution ... outweighs the need to provide restitution to any victims...." 18 U.S.C. § 3663(d). The Government concedes that an opinion by Judge Posner, applied by analogy, would preclude the ruling here sought. *United States v. Fountain*, 768 F.2d 790 (7th Cir.1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). The Government contends, however, that the case was "wrongly decided" and urges the court to follow other decisions from the Third and Tenth Circuits. *United States v. Pollak*, 844 F.2d 145, 154 n. 12 (3d Cir. 1988); *United States v. Sleight*, 808 F.2d 1012, 1018 (3d Cir.1987); *United States v. Richard*, 738 F.2d 1120, 1123 (10th Cir.

1984). I conclude that the Third and Tenth Circuit cases are not factually supportive of the Government's claim. While I tend to agree with a separate opinion of Judge Swygert in *Fountain*, which would leave discretion to the district courts, I conclude that the issues in this case as developed at the hearing and in briefing are considerably more complex than those deemed inappropriate in *Fountain*, and that the Government is here advocating the use of excessive satellite litigation not fairly contemplated by the restitution provisions in the criminal code.

■ Before returning to the cited cases I note that the Government's own analysis shows that it is overburdening the sentencing process in this case, and that the questions of restitution for allegedly destroying the business should be left to appropriate civil litigation brought by the trustee in bankruptcy. The record already made may be treated as discovery or used as partial proof by stipulation. At the court's request, Government counsel stated his view that restitution proceedings at the remedial stage of criminal cases should take not more than perhaps half a day to try, and that the sort of claim the court should avoid would be typified by a personal injury pain and suffering claim asserted by the victim of a crime. The claim before me could not reasonably be tried in three or four hours (unless uncontested) and resolution by the court would, if not expedited to accommodate sentencing, take quite a few weeks or even months to decide, particularly since the Government concludes that findings of fact are probably required. Compared with a pain and suffering claim, which the Government concedes is inappropriate,[2] this restitution claim is a can of worms.

■ The *Fountain* case is the leading case in this area of the law, although not referred to in the later *Sleight* and *Pollak*

---

**2.** The court notes that the Government's concession was carefully tailored to comply with Congressional intent. A bodily injury criminal case may result in various kinds of recovery, patently omitting an allowance for pain and suffering. 18 U.S.C. § 3663(b)(2). I do note that the court is authorized, and perhaps required, to make a

suitable award for demonstrated loss of income to a personal injury victim. This is to be distinguished from the more speculative allowance for lost *future* income, which the Seventh Circuit opinion in *Fountain* holds should not be adjudicated by the district courts, if not uncontested or stipulated.

cases. After careful consideration, the opinion holds that "an order requiring a calculation of lost future earnings unduly complicates the sentencing process and hence is not authorized by the Victim and Witness Protection Act—unless, to repeat a vital qualification, the amount is uncontested, so that no calculation is required." 768 F.2d at 800–802. Judge Swygert, concurring and dissenting, would allow recovery of lost future income on a case-by-case basis, leaving the issue of excessive complexity to the initial discretion of the district judges. 768 F.2d at 808. While I tend to agree with Judge Swygert, and can readily suppose a situation where I would think lost future income could be heard *and determined* in a half-day hearing (adapting the Government's suggested test, which I accept as reasonable), the issues in this case are obviously much more complex than in *Fountain,* and the rationale of the *Fountain* prohibition clearly applies here.

The *Richard* case is not really in point. The loss to the bank from a robbery was easily calculated. The defendant contended there would be undue commitment of judicial resources to allocate the loss between various individuals. That claim was rejected because allocation was not legally required.

*Sleight* and *Pollak* are more nearly supportive of the Government's claim in that they speak of allowing claims for lost profits of a business. In *Sleight,* however there was really an order that kickbacks be disgorged. The complexity of proof seems to have been minimal. The calculation in *Pollak* was also a simple one.

It is not worthwhile to probe further into all the nuances in the testimony in this case relating to whether the Bengiminas were demonstrably responsible for destroying the ongoing prospects of the bankrupt corporation, whether the bankrupt cigarette vending operation had going-concern value, and how much the stricken business may have been worth.[3] The issues were at least as complex as in the ordinary court-tried case, and probably more so. If the statute requires such a trial and resolution by the court it is very difficult to imagine that even 1% of the criminal docket would escape a restitution order on grounds of undue complexity. The Congressional exception deserves more frequent use. Absent a stronger message from Congress, satellite litigation of this magnitude should not be allowed to clog the courts' dockets, with time pressures favoring priority over ordinary litigation so that defendants can be sentenced without extraordinary delay. In weighing the consequences of invoking § 3663(d) I believe the court should also be mindful of whether a victim without resources has an interest in the case or whether the victim is a well-represented corporation or some such entity as a bankruptcy estate. This case seems unmistakably outside the scope of intended Congressional relief, given the docket priorities fairly given to other, older civil litigation.

Since I have determined, however, in John Bengimina's case, to use a rather generous figure of $450 per location, apart from valuation of the going-concern worth of the entire enterprise, the 31 locations ultimately taken (including 13 on the first round) would be given a value of $13,950. Making Thomas and Charles Bengimina responsible for sharing 30 such losses would result in a restitution order of $6,750 apiece, in addition to any responsibility for the loss of cash. From the information presented I believe such payments are feasible within the five-year period specified by Congress (18 U.S.C. § 3663(f)(2)) although payments will not be easy.[4] Thomas, the most prosperous member of the family, has been reporting an adjusted gross income of about $18,000 annually, and Charles has at

---

**3.** Possible knowledgeable testimony from the Gulotta family was notably missing from the Government's case.

**4.** It is thus unnecessary in this case to consider whether restitution orders *must* be limited to a defendant's apparent ability to pay within the five-year period after any imprisonment. *See*

18 U.S.C. § 3664(a). Developing case-law indicates that the requirement of prompt restitution has a side effect limiting the amount of restitution. *United States v. Keith,* 754 F.2d 1388, 1393 (9th Cir.1985); *United States v. Bruchey,* 810 F.2d 456, 460 (4th Cir.1987); *United States v. Mahoney,* 859 F.2d 47 (7th Cir.1988).

least a half interest in the current rather shaky business.

Counsel advise that Thomas and Charles Bengimina acknowledge a criminal violation with respect to the loss of $900 in cash referred to at the change of plea, but not with respect to the loss of locations. Whether they are assessed the sums stated depends, therefore, on the present record and any further showing made by the parties at sentencing.[5]

It is therefore ORDERED that John Bengimina's restitution will be limited to $450, and the restitution order as to Thomas and Charles will be entered at sentencing consistently with this ruling.

---

**5.** It is my present view that a fair reading of Judge See's oral prohibition on touching the assets of Bee Gee and Comp–Tech did reach the

removal of equipment, even though it was not on the main premises of the business.