**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 95-30275

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

VERSUS

ROBERT DUPRE and W. HAROLD SELLERS,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Eastern District of Louisiana

_____

July 11, 1997

Before DAVIS and DENNIS, Circuit Judges, and FALLON,[1] District
Judge.

W. EUGENE DAVIS, Circuit Judge:

W. Harold Sellers and Robert Dupre appeal their convictions on
multiple counts related to loans received from the Oak Tree Savings
Bank in New Orleans, Louisiana, to finance various real estate
transactions in California. For the reasons that follow, we affirm
their convictions on all counts and remand for fact-finding on two
sentencing issues.

I.

_____

[1]District Judge of the Eastern District of Louisiana, sitting
by designation.

In 1987, Dupre and Michael Barrack, both California businessmen, and Sellers, a Houston attorney, founded LaJolla Pacific Equities, Inc. (LPE), a California real estate operation. In 1988, LPE purchased four pieces of property from Braewood Development: Loma Linda, Sunrise Ranch, Lower Etiwanda, and Moreno Valley. Lomas Financial Corp. (Lomas), Braewood's parent company, financed the purchase. The deal included an interest reserve that allowed LPE to defer interest payments for approximately a year.

In the fall of 1988, as the deadline for the interest reserve approached, Sellers and Dupre sought refinancing for the Lomas loans. John Ohanian, an employee of Landmark Land of California, Inc. (LOCAL), contacted Sellers and Dupre about buying the Moreno Valley and Sunrise Ranch properties. Sellers and Dupre refused to sell, but gave LOCAL an option on the two properties in return for refinancing the Lomas debt. Ohanian and his boss, Ernie Vossler, worked with LOCAL's parent company, the Oak Tree Savings Bank (OTSB), to arrange the refinancing. Vossler recommended to the OTSB board that the bank provide a $69 million loan to LPE. This sum included $55.8 million to refinance the Lomas debt on all four properties, payment for various fees and taxes, and $4.2 million to allow LPE to purchase another property called Upper Etiwanda.

Sellers and Dupre told OTSB officials that Upper Etiwanda, a property adjacent to Lower Etiwanda, was priced at $6.2 million, and they requested $4.2 million to pay off the property. Dupre and Sellers did not reveal to the bank that Minter Interests, Inc., a company that Sellers created under an assumed name, already owned

2

Upper Etiwanda. Appellants' corporation, Minter Interests, had purchased Upper Etiwanda for roughly $1.6 million; it "sold" the property to appellants for $6.2 million.

Meanwhile, Sellers, Dupre, and Barrack negotiated a loan discount from Lomas on their original debt by claiming inability to pay and threatening to sue for usury. Lomas agreed to a $3 million reduction on its $55.8 million loan. At the December 21, 1988, closing, appellants denied to Ohanian that they had received a discount on the Lomas debt. Shortly after OTSB distributed the full amount of the loan--$55.8 million--to Lomas, Lomas wired the $3 million loan discount to Sellers. Sellers and Dupre wired proceeds from both the loan discount and the sale of Upper Etiwanda to domestic accounts and accounts in the Cayman Islands.

Barrack testified for the government that as Sellers and Dupre left the OTSB loan closing, Dupre told him he had "taken care of" Ohanian, the LOCAL representative. Ohanian admitted accepting $75,000 from Dupre and pleaded guilty to the felony of accepting a gift to procure a loan, in violation of 18 U.S.C. § 215. Dupre and Sellers claim that Vossler arranged a "bonus" for Ohanian to be paid directly by Sellers and Dupre to avoid making other employees jealous. Vossler denied this in his testimony.

LOCAL purchased both Etiwanda properties in March 1989. OTSB required that $3.8 million from the sales be placed in a certificate of deposit (CD) for collateral on the loan for the Loma Linda property. In 1989, Sellers and Dupre obtained permission from OTSB to withdraw $1.5 million from the CD to buy four new

3

properties that would serve as collateral for the loan. Dupre and Sellers, operating under Inland Pacific Real Estate, Inc., immediately used some of the funds for overhead and costs. They never purchased the properties.

The jury convicted Sellers and Dupre on one count of conspiracy, in violation of 18 U.S.C. § 371 (count 1); two counts of bank fraud, in violation of 18 U.S.C. § 1344 (counts 2 and 3); two counts of making false statements to a federally insured bank, in violation of 18 U.S.C. § 1014 (counts 4 and 6); and eight counts of money laundering, in violation of 18 U.S.C. § 1957. (counts 7-15). In a bifurcated proceeding, the jury returned a special forfeiture verdict of $7,070,463, representing the proceeds of money laundering, against both Sellers and Dupre. Sellers received concurrent sentences of 60 months for counts 1 and 2, 76 months for each of counts 3, 6, and 7-15, and 24 months for count 4, requiring him to serve a total of 76 months. He was ordered to pay $2,000,000 in restitution. Dupre received concurrent sentences of 60 months for counts 1 and 2, 70 months for each of counts 3, 6, and 7-15, and 24 months on count 4, requiring him to serve a total of 70 months. He was ordered to pay $500,000 in restitution.[2]

The defendants timely appealed. We consider below appellants' challenges to their convictions.

## II.

Sellers and Dupre first challenge the district court's

_____

[2]Michael Barrack, who was also charged in the indictment, pleaded guilty to one count charging conspiracy to make false statements to a federally insured bank.

instructions to the jury. Specifically, they argue that the materiality of their allegedly fraudulent statements was an essential element of the bank fraud and false statement offenses, and, therefore, that the district court erred in failing to submit materiality to the jury. The district court followed the law of this circuit at the time of trial and decided the issue of materiality as a matter of law. However, in June 1995, the Supreme Court overruled the position held by this court and most other federal circuits and concluded that when materiality is an element of the charged offense, it presents a mixed issue of law and fact to be decided by a jury. United States v. Gaudin, 115 S.Ct. 2310, 2314-15 (1995). The appellants argue that the trial court's failure to submit the question of materiality to the jury violates their constitutional rights and requires reversal of their convictions on counts 2, 3, 4, and 6.[3]

### A.

Counts 2 and 3 charge appellants with bank fraud under 18 U.S.C. § 1344. The counts arise from appellants' misrepresentations about the purchase price of Upper Etiwanda and the loan discount (count 2) as well as the intended use of $1.5 million in released collateral (count 3). A violation of § 1344 is established when the government demonstrates that the defendant knowingly executed or attempted to execute a scheme or artifice (1) to defraud a financial institution or (2) to obtain any property

---

[3]A panel of this court released Sellers and Dupre pending appeal after the Supreme Court rendered its decision in Gaudin.

5

owned by, or under the custody or control of, a financial institution, through false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1344. On its face, the text of the statute does not require that false statements integral to § 1344 be material.[4] Nevertheless, many circuits, including this one, have required a showing of materiality. *See, e.g.*, United States v. Goldsmith, 109 F.3d 714, 715 (11th Cir. 1997); United States v. Campbell, 64 F.3d 967, 975 (5th Cir. 1995); United States v. Smith, 46 F.3d 1223, 1236 (1st Cir.), *cert. denied*, 116 S. Ct. 176 (1995); United States v. Hutchison, 22 F.3d 846, 851 (9th Cir. 1993); United States v. Davis, 989 F.2d 244, 247 (7th Cir. 1993); United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992), *cert. denied*, 507 U.S. 985 (1993); United States v. Sayan, 968 F.2d 55, 61 n.7 (D.C. Cir. 1992); United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987). A recent Supreme Court decision casts doubt on this determination. In U.S. v. Wells, 117 S. Ct. 921 (1997), the Court considered whether 18 U.S.C. § 1014--which prohibits the making of a false statement to a federally insured bank--contains a materiality requirement when the statute itself does not mention materiality. It concluded, contrary to most

_____

[4]In full, § 1344 provides:
Whoever knowingly executes, or attempts to execute, a scheme or artifice--
    (1) to defraud a financial institution; or
    (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
18 U.S.C. § 1344.

6

circuit courts, that materiality was not an element of the offense under a plain reading of the text and that statutory history confirmed that reading. Id. at 927-28.

Since Wells, we have not revisited whether materiality is an element of a § 1344 offense, which, like § 1014, does not contain an express materiality requirement. However, we conclude that appellants' convictions will stand even if materiality is an element of a § 1344 offense and the jury instructions were erroneous. Therefore, we need not determine here whether our previous holding that materiality is an essential element of a § 1344 offense survives Wells.

Although appellants objected to the court's treatment of materiality with respect to the § 1014 false statement counts, they did not object to the district court's failure to submit materiality to the jury on the § 1344 bank fraud counts. Sellers' attorney stated:

> As to the false statements on page 23 [the page of the court's jury instructions on the § 1014 counts], we object to the failure to instruct the jury on materiality . . . . It's the position of the defendants that the failure to charge on that issue is vital [to] the defendants' right to a jury trial in that element to that offense.

This makes no reference to counts 2 and 3, the § 1344 counts, and, in fact, specifically limits the objection to the false statement counts.[5]

---

[5]Sellers' attorney did object to the instructions as to the § 1344 counts. However, the objection went to the intent necessary to support a conviction on those counts and had no relation to the materiality issue.

7

The only indication that the appellants wanted the court to send materiality to the jury on the § 1344 counts is their proposed jury instructions, which read:

> In order to find Mr. Sellers and Mr. Dupre guilty of . . . committing bank fraud . . ., the government must prove beyond a reasonable doubt that the statements and/or the false or fraudulent pretenses were material. A statement is material if it is capable of influencing the decision of the financial institution. The appropriate question to ask is, "if the bank had relied on the defendant's statements, would it have made any difference?["]

However, under Rule 30 of the Federal Rules of Criminal Procedure, these proposed instructions do not preserve error on appeal, absent an objection specific to the counts at issue.[6] *See* United States v. Hoelscher, 914 F.2d 1527, 1534 (8th Cir. 1990), *cert. denied*, 500 U.S. 943 (1991); United States v. Beverly, 913 F.2d 337, 357 (7th Cir. 1990), *cert. denied*, 498 U.S. 1052 (1991); United States v. Friedman, 854 F.2d 535, 555 (2d Cir. 1988), *cert. denied*. 490 U.S. 1004 (1989); *cf.* McDaniel v. Anheuser-Busch, Inc., 987 F.2d 298, 306 (5th Cir. 1993) (concluding that, under Fed. R. Civ. P. 51, the civil counterpart to Fed. R. Crim. P. 30, "a pretrial request for instructions or interrogatories is ordinarily

---

[6]Rule 30 provides:
> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. . . . *No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict*, stating distinctly the matter to which that party objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

Fed. R. Crim. P. 30 (emphasis added).

8

insufficient to preserve error").  Because appellants failed to object to the denial of the requested materiality instruction with regard to the § 1344 counts, we review the Gaudin-error claim for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure.  Johnson v. United States, 117 S. Ct. 1544, 1548-49 (1997); United States v. Jobe, 101 F.3d 1046, 1061-62 (5th Cir. 1996).  In doing so, we are guided by the plain-error analysis outlined in United States v. Olano, 507 U.S. 725, 730-36 (1993), and reiterated in the context of Gaudin error in Johnson v. United States.[7]  Under the Olano analysis, this court may reverse only if: (1) there was error (2) that was clear and obvious and (3) that affected a defendant's substantial rights.  United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir. 1994) (*en banc*) (citing Olano, 507 U.S. at 730-36), *cert. denied*, 115 S. Ct. 1266 (1995).  When these elements of plain error are present, a court may exercise its discretion to correct the error if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  Id. at 164 (quoting Olano, 507 U.S. at 732).

For our purposes, we assume that under Gaudin, the court's failure to submit materiality to the jury was error, and, therefore, the first prong of Olano is met.  The second prong--the plainness of the error--requires greater analysis.  The Supreme

---

[7]In Johnson, a defendant convicted of perjury contended that the court committed reversible error because it failed to submit materiality--an express element of perjury under 18 U.S.C. § 1623-- to the jury.  The court held that the claimed Gaudin error was not the type of "plain error" that a court may notice under Rule 52(b). Johnson, 117 S. Ct. at 1547.

9

Court in <u>Johnson</u> resolved confusion among the circuits and, indeed, within this one,[8] when it held that in cases "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal--it is enough that an error be 'plain' at the time of appellate consideration." <u>Johnson</u>, 117 S. Ct. at 1549. Thus, in reviewing the district court's jury instructions for plain error, we look to the law--all of the law--as it now exists on appeal. After <u>Gaudin</u>, we assume that the district court erred in failing to submit materiality--long considered an element of § 1344--to the jury. However, in light of <u>Wells</u>, the plainness of that error is suspect. As we noted in <u>Calverley</u>, "'plain' errors are errors which are 'obvious,' 'clear,' or 'readily apparent;' they are errors which are so conspicuous that 'the trial judge and prosecutor were derelict in countenancing [them], even absent the defendant's timely assistance in detecting [them].'" <u>Calverley</u>, 37 F.3d at 163 (citations omitted). <u>Wells</u>' rejection of materiality as an element of a § 1014 offense casts doubt on this circuit's holding that materiality is an element of § 1344 violations and, therefore, renders the claimed error unclear.

The decisions in <u>Gaudin</u> and <u>Wells</u> have prompted this court and others to revisit implied materiality requirements in various statutes. For example, in <u>United States v. Harvard</u>, 103 F.3d 412, 418 (5th Cir. 1997), we concluded that materiality is not an

---

[8]*Compare* <u>Calverley</u>, 37 F.3d at 162-63 (requiring that plain error be "'clear under current law' at the time of trial") *with* <u>Jobe</u>, 101 F.3d at 1062 (holding that plain error is measured at time of appeal).

10

element of 18 U.S.C. § 1005. Likewise, the Eleventh Circuit held that Wells operated to overrule its decisions requiring materiality for § 1010 violations. United States v. de Castro, 113 F.3d 176 (11th Cir. 1997); *see also* United States v. Upton, 91 F.3d 677, 685 (5th Cir. 1996) (holding that materiality is not an element of § 287 offense), *cert. denied*, 117 S. Ct. 1818 (1997). *But see* United States v. Shunk, 113 F. 3d 31, 34 (5th Cir. 1997) (declining to re-examine whether materiality is element of § 1006 offense). As these cases demonstrate, whether materiality is properly considered an element of § 1344 after Wells, when it is not expressly required by statute, is unsettled. Any error committed by the court in withholding materiality from the jury was therefore not plain or obvious. Because the court's error is not obvious after Wells, we cannot say that the district court committed plain error in failing to submit materiality to the jury on the § 1344 counts.

### B.

Appellants argue next that the district court erred in failing to submit materiality to the jury on the § 1014 counts. Counts 4 and 6 charged appellants with making a false statement to OTSB, a federally insured financial institution, to influence the actions of the bank. The false statements at issue relate to the purchase price of Upper Etiwanda (count 4) and the intended use of $1.5 million in released collateral (count 6). To obtain a conviction on a § 1014 offense, this circuit has previously required the government to show that the false statements were material. *See* United States v. Thompson, 811 F.2d 841, 844 (5th

11

Cir. 1987).  However, as noted, this position has been squarely rejected by the Supreme Court in <u>Wells</u>, 117 S. Ct. at 926-28. Because § 1014 does not require that the false statement at issue be material, the district court did not err in failing to submit materiality to the jury on these counts.

III.

Appellants next contend that counts 2 and 3, charging bank fraud, are multiplicious with counts 4 and 6, charging the making of false statements, and that these duplicitous charges subjected them to double jeopardy.  Count 2 charges bank fraud in connection with appellants' misrepresentations about the price and ownership of Upper Etiwanda.  Similarly, count 4 charges appellants with making a false statement for the same misrepresentations.  Counts 3 and 6 charge bank fraud and false statements, stemming from appellants' false representations in connection with the withdrawal of $1.5 million in released collateral.

We review issues of multiplicity *de novo*.  <u>United States v. Hord</u>, 6 F.3d 276, 280 (5th Cir. 1993), *cert. denied*, 511 U.S. 1036 (1994).  In cases where a single act supports convictions under different criminal statutes, double jeopardy concerns are not implicated when "each provision requires proof of a fact which the other does not."  <u>United States v. Galvan</u>, 949 F.2d 777, 781-82 (5th Cir. 1991); *see* <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932).

Our decision in <u>United States v. Henderson</u>, 19 F.3d 917 (5th Cir.), *cert. denied*, 513 U.S. 827 (1994), is factually

12

indistinguishable from this case and controls our decision here. In Henderson, the defendant was convicted for multiple counts related to fraudulent banking activities. Id. at 919. On appeal, he contended that counts charging bank fraud in violation of § 1344 and making false statements to a federally insured bank in violation of § 1014 were multiplicious because they involved identical conduct related to one loan. Id. at 925-26. After comparing the two provisions, we rejected Henderson's contention. Id. at 926.

As we explained in Henderson, bank fraud under § 1344 requires proof of a "scheme or artifice" to defraud or to obtain property from a federally insured financial institution. Id.; 18 U.S.C. § 1344. "There is no 'scheme or artifice' requirement in section 1014. Further, there is no requirement that the person charged with bank fraud make a . . . false statement to an insured bank." Henderson, 19 F.3d at 926. Because each statute requires proof of an additional fact, the bank fraud and false statement counts are not multiplicious. See United States v. Fraza, 106 F.3d 1050, 1053 (1st Cir. 1997) (recognizing that "on the plain language of these statutes, the requirements of Blockburger are satisfied"); United States v. Wolfswinkel, 44 F.3d 782, 785 (9th Cir. 1995) (concluding that bank fraud and misapplication of bank funds do not constitute same offense). But see United States v. Seda, 978 F.2d 779, 782 (2d Cir. 1992) (holding that §§ 1014 and 1344 are multiplicious when they arise from the same offense). We therefore reject appellants' multiplicity and double jeopardy arguments.

13

IV.

Sellers and Dupre raise several objections to the sufficiency of the evidence supporting their convictions on the counts discussed below. The evidence is sufficient to support a guilty verdict if a rational jury could have found the essential elements of the crime beyond a reasonable doubt. United States v. Salazar, 958 F.2d 1285, 1290-91 (5th Cir.), *cert. denied*, 506 U.S. 863 (1992).

A.

Counts 2 and 4 charge Sellers and Dupre with bank fraud and making false statements in connection with their misrepresentations about the purchase price of Upper Etiwanda. Sellers and Dupre argue that the evidence is insufficient to establish beyond a reasonable doubt that they knowingly committed bank fraud and made false statements in connection with the loan for the property.

The record reveals that appellants' communications with the bank about Upper Etiwanda were riddled with misrepresentations. The government produced evidence that Sellers and Dupre, acting as Minter Interests, exercised an option to buy Upper Etiwanda from Etiwanda Highland Property, Ltd., for approximately $1.6 million on December 14, 1988. Sellers and Dupre submitted an earnest money contract to the bank showing that Minter Interests was selling Upper Etiwanda for roughly $6.2 million. The contract was purportedly signed by Minter's vice president, a California attorney named Joe Kennedy. Kennedy testified that he had not seen or signed the document and that he had nothing to do with Minter

14

Interests.  On December 21, a week after Minter Interests purchased the property, the two appellants borrowed $4.2 million from OTSB to buy Upper Etiwanda from Minter Interests.[9]

Sellers and Dupre never disclosed to OTSB their interest in Minter or the amount actually necessary to buy Upper Etiwanda in an arms-length transaction.  *See, e.g.*, United States v. Trice, 823 F.2d 80, 86 (5th Cir. 1987) (noting that § 1014 may be violated by "the failure to disclose material information needed to avoid deception in connection with a loan transaction").  Nor did appellants use the loan money to buy the property.  According to exhibits and Sellers' testimony, most of the funds were wired to domestic accounts and accounts in the Cayman Islands.  Based on the evidence in the record, the jury was entitled to infer that the true facts underlying appellants' purchase of the property-- including their interest in Minter and the amount actually necessary to buy it in an arms-length transaction--were material to the lender.  The record supports the conclusion that appellants orchestrated a scheme to obtain funds from OTSB, in part, by knowingly misrepresenting the price of Upper Etiwanda.

Count 2 also charges Sellers and Dupre with bank fraud in connection with the $3 million discount that LPE negotiated with Lomas and that appellants concealed from OTSB.  Appellants represented to OTSB that they needed to refinance a $55.8 million loan from Lomas.  However, Lomas officials testified that,

---

[9]Bank officials testified that they believed appellants had made a $2 million down payment on the property.

15

beginning in the first week of December 1988, appellants sought a discount on the loan. By mid-December, Lomas had agreed to give appellants and Barrack a $3 million loan discount, thereby reducing the total loan amount to $52.8 million. Ohanian testified that he asked appellants at the OTSB loan closing on December 21, 1988, whether they had received a discount and Dupre reportedly stated, "we didn't get that work[ed] out." Numerous OTSB officials testified that they would have reduced the OTSB loan by $3 million had they known of the discount. Viewing this evidence in the light most favorable to the government, the jury was entitled to infer that appellants misrepresented the balance owed on the loan OTSB agreed to refinance.

Counts 3 and 6 charge Sellers and Dupre with bank fraud and making false statements in connection with their withdrawal of $1.5 million from the $3.8 million CD pledged as collateral for the OTSB loan. Appellants obtained permission to withdraw the funds in August 1989 allegedly to buy additional property. The government produced correspondence from OTSB to Sellers and Dupre showing that OTSB agreed to the withdrawal on the condition that Sellers and Dupre "use the Funds to provide downpayments on . . . parcels of property in southern California," advise OTSB of the status of the proposed purchases, and allow OTSB, by contract, to receive 50% of subsequent sales of each of the properties to pay the balance of the loan. OTSB required that LPE's board of directors authorize the withdrawal of funds, and LPE provided a corporate resolution representing that Sellers, Dupre, and Barrack approved the

16

withdrawal. Barrack testified that he did not approve the withdrawal and, in fact, had no knowledge of the scheme to obtain funds. The evidence showed that $1.5 million was released to LPE, and $810,000 was immediately transferred to Inland Pacific, a corporation owned by Sellers and Dupre that did not involve Barrack; the funds were spent on Inland Pacific operating costs. The record shows that no funds were used to purchase property.

Based on this evidence, a reasonable jury was entitled to conclude that appellants made false representations regarding the use of the $1.5 million to induce the bank to approve the withdrawal.

B.

Next, Sellers and Dupre contend that the evidence is insufficient to support their convictions for conspiracy under count 1. To establish a conspiracy violation under 18 U.S.C. § 371, the government must establish: (1) an agreement between two or more people, (2) to commit a crime against the United States, and (3) an overt act by one of the conspirators to further the objectives of the conspiracy. United States v. Krenning, 93 F.3d 1257, 1262 (5th Cir. 1996). Count 1 charges conspiracy to commit the various crimes in counts 2-4 and 6 and conspiracy to unlawfully give money to an agent of the bank in violation of 18 U.S.C. § 215(a). As outlined above, the evidence demonstrates that Sellers and Dupre jointly participated in the activities underlying counts 2-4 and 6. This evidence of cooperative effort is sufficient to support appellants' convictions for conspiracy to commit bank fraud

17

and make false statements.  We turn to the sufficiency of the evidence to support the conspiracy to give money to an agent of a bank.

Section 215 (a)(1) provides:

> (a) Whoever--
> (1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution;
> . . . .
> shall be fined...or imprisoned...or both.

18 U.S.C. § 215.

Sellers and Dupre argue that the evidence was insufficient to demonstrate that John Ohanian, an employee of LOCAL, an OTSB subsidiary, acted as an agent or employee of OTSB or that Sellers and Dupre corruptly rewarded him for providing them with a loan. The government's evidence showed that Ohanian collected loan documentation for OTSB, including financial statements and corporate documents, assisted in negotiations, and was present at the loan closing.  Sellers and Dupre used Ohanian as their contact with the bank, and Sellers stated in deposition testimony that Ohanian was an agent of the bank.  This evidence demonstrates that Ohanian acted on the bank's behalf, under its control, and with its consent.  *See* Restatement (Second) of Agency § 1.  Viewing this evidence in the light most favorable to the government, a rational jury could conclude beyond a reasonable doubt that Ohanian was an agent of OTSB.

The government also produced evidence that Dupre paid Ohanian

18

$75,000 in connection with the refinancing of the Lomas loan by OTSB.  Ohanian testified that he and Dupre met at Dupre's country club a day or two after the loan closed and that Dupre gave him a personal check for $75,000.  Barrack testified that Dupre told him he was "going to take care of" Ohanian by giving him a personal check that would not appear on LPE books.  Ohanian later pleaded guilty to accepting a bribe under 18 U.S.C. § 215 (a)(2).[10]  Based on this evidence, a jury was entitled to conclude that Sellers and Dupre agreed to reward Ohanian for obtaining the loan in violation of § 215 (a)(1).

C.

Dupre and Sellers also challenge the sufficiency of the evidence supporting their conviction on several of the money laundering counts.  They further contend that their convictions on all of the money laundering counts must be reversed because they fail to charge an offense.

Counts 7-12 allege that Sellers and Dupre violated 18 U.S.C. § 1957 when they transferred $4.2 million obtained from the "sale" of Upper Etiwanda from Minter Interests to LPE to personal bank accounts in the Cayman Islands and elsewhere.  To support a

---

[10]Under 18 U.S.C. § 215(a)(2):
(a) Whoever--
    . . .
    (2) as an officer, director, employee, agent, or attorney
    of a financial institution, corruptly solicits or demands
    for the benefit of any person, or corruptly accepts or
    agrees to accept, anything of value from any person,
    intending to be influenced or rewarded in connection with
    any business or transaction of such institution;
shall be fined . . . or imprisoned . . . or both.

19

conviction under § 1957, the government must prove that the defendant "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).

Sellers and Dupre argue, without support, that because the Upper Etiwanda property had some value, the entire $4.2 million did not constitute criminally derived property under the money laundering statute. We disagree. The evidence, outlined above, was sufficient to support appellants' convictions for bank fraud charged in count 2. Based on that evidence, the jury was entitled to conclude that the proceeds of the loan--$4.2 million--was derived as a result of appellants' unlawful scheme to obtain a loan from OTSB through misrepresentation. Therefore, appellants' convictions on these counts will stand.

Sellers and Dupre also argue that the district court erred in refusing to dismiss all of the money laundering counts (counts 7-15)--involving roughly $7,000,000--on the ground that they failed to charge an offense under § 1957. In each of the transactions underlying these counts, portions of proceeds from the $69 million loan and the loan discount in Sellers' Century Land Title account were wired to accounts in the Cayman Islands and to appellants' domestic accounts. To establish a violation of § 1957, the government was required to prove that the funds at issue were

20

derived from a criminal offense when the appellants transferred them. United States v. Leahy, 82 F.3d 624, 635 (5th Cir. 1996). Appellants argue that, as alleged in the indictment, the underlying bank fraud counts were not completed until the money was transferred to the Cayman Island and domestic accounts. Thus, according to appellants, at the time of the transfer the funds were not criminally derived--that is, the proceeds of a crime.[11] *See* United States v. Johnson, 971 F.2d 562, 569 (10th Cir. 1992).

Appellants read the language in count 2 too broadly. The bank fraud charged in count 2 was complete when Lomas and OTSB, through Chicago Land Title Company, transferred the funds in question to Sellers' account in Houston, Texas. The crime was complete and the funds became "criminally derived property" when they came under Sellers' control. *See* United States v. Allen, 76 F.3d 1348, 1360 (5th Cir.) ("[T]he funds at issue in each of the transactions became proceeds at the moment the money left the control of [the bank] and was deposited into an account of a consultant or borrower."), *cert. denied*, 117 S. Ct. 121 (1996). Therefore,

---

[11]According to count 2, appellants:

did knowingly devise and intend to devise a scheme and artifice to defraud Oak Tree Savings Bank and obtain money and funds owned by and in the custody and control of Oak Tree Savings Bank by means of false and fraudulent pretenses, representations and promises by applying for and receiving a loan in the approximate amount of $69,000,000, to be used for the purposes set forth in the loan documentations submitted to Oak Tree Savings Bank when in truth and in fact, [appellants] concealed from Oak Tree Savings Bank that portions of the proceeds of the $69,000,000 loan would be diverted to their personal benefit and would not be utilized for the purpose and in the manner set forth in the loan documentation.

counts 7-15, which stemmed from the subsequent wire transfers of funds to appellants' accounts in Cayman Islands and throughout the United States, properly charged money laundering for purposes of § 1957.

D.

In their final sufficiency attack, Sellers and Dupre argue that the evidence does not establish venue as to all counts because none of the offenses in the indictment were committed in the Eastern District of Louisiana.

The government must prove venue by a preponderance of the evidence. Leahy, 82 F.3d at 632. By statute, venue for continuing offenses will lie "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Bank fraud, false statement, and money laundering offenses are "continuing" offenses for purposes of § 3237. *See* United States v. Hubbard, 889 F.2d 277, 280 (D.C. Cir. 1989); Leahy, 82 F.3d at 633; United States v. Beddow, 957 F.2d 1330, 1335 (6th Cir. 1992). Counts 2 and 4 charge appellants with bank fraud and false statement offenses in connection with the initial $69 million loan from OTSB, located in the Eastern District of Louisiana. Counts 3 and 6, also charging bank fraud and false statement offenses, relate to appellants' withdrawal of $1.5 million from a CD pledged on the loan. Counts 7-15 charge money laundering using funds derived from the bank fraud.

Sellers and Dupre argue that venue was improper as to all of these counts because the government failed to show that they knew

22

OTSB was disbursing proceeds of the $69 million loan.  They contend that they entered into a loan agreement with Oak Tree Mortgage Corporation (OTMC), an Oklahoma corporation that is not a federally insured institution and that is authorized to do business in California.  According to appellants, OTMC subsequently assigned the loan to, and obtained funding from, OTSB, a federally insured institution.[12]

Appellants' contention is belied by the record.  Among other documents, the government produced: (1) a loan application, dated December 20, 1988, and signed by Sellers, which contained a warning that "knowingly mak[ing] any false statements" in the application constituted a § 1014 violation--a warning only required where the lender is federally insured; (2) a commitment letter dated December 8, 1988, from John Taylor, an OTSB official, on OTSB letterhead, which identified the lender as OTSB, was signed by Dupre, and returned to OTSB; (3) a financing statement, dated December 21, 1988, and signed by Sellers, on which OTSB is designated as the secured party; and (4) a check, dated December 9, 1988, written on LPE's account to OTSB for $50,000, the amount stipulated in the commitment letter.  Additionally, both Sellers and Dupre testified that they had extensive experience with real-estate investment transactions.  Dupre had worked in real-estate acquisitions since the early 1970s; Sellers had practiced real-estate law for more than 25 years.  *See* United States v. Allen, 76 F.3d 1348 (5th Cir.

---

[12]OTMC and OTSB are both subsidiaries of Landmark Land Company, Inc.

23

1996) (holding that evidence showing that defendants were financially sophisticated and had received documents referring to bank was sufficient to establish that they knew they were defrauding bank).

The government's documentary evidence, when considered in light of appellants' business and legal background, is more than adequate to establish by a preponderance of the evidence that venue was proper in the Eastern District of Louisiana.

V.

Finally, Sellers and Dupre allege prosecutorial misconduct in connection with the government's remarks about a prospective defense witness.[13] Near the end of the trial, appellants planned to call Kenneth Pickering, a former Louisiana Banking Commissioner, to testify on banking practices and regulations. They contend that Pickering would have testified that fees are commonly paid to loan brokers, such as Ohanian, and that OTMC and OTSB were legally distinct entities. The government told the district court that Pickering was under federal investigation in two unrelated matters and that the information might be relevant for impeachment purposes on cross-examination. After inquiring *in camera* as to the government's basis for cross-examination, the court, in turn, informed Pickering that he might face questioning on the issue. Pickering later declined to testify as a banking expert. Dupre and

---

[13]Appellants also challenge the district court's admission of various pieces of evidence; its instructions relating to willful blindness; and its refusal to depart downward in its sentencing. After a review of the record, we conclude that these contentions are meritless and unworthy of greater discussion.

24

Sellers moved for a mistrial on the grounds of prosecutorial misconduct or, in the alternative, a recess to find a new banking expert. Their motions were denied.

We review the denial of a motion for mistrial for abuse of discretion. *See* United States v. Bentley-Smith, 2 F.3d 1368, 1378 (5th Cir. 1993). Under the Sixth Amendment, a criminal defendant has the right to present witnesses to establish his defense without fear of retaliation against the witness by the government. Webb v. Texas, 409 U.S. 95, 98 (1972). "[S]ubstantial governmental interference with a defense witness' choice to testify may violate the due process rights of the defendant." United States v. Whittington, 783 F.2d 1210, 1219 (5th Cir.), *cert. denied*, 479 U.S. 882 (1986); *see, e.g.*, United States v. Hammond, 598 F.2d 1008, 1012 (5th Cir. 1979) (reversing because FBI agent told defense witness that he would have "nothing but trouble" in pending state prosecution if he persisted in testifying); United States v. Henricksen, 564 F.2d 197, 198 (5th Cir. 1977) (reversing where government threatened to void plea bargain if potential witness testified); United States v. Smith, 478 F.2d 976, 979 (D.C. Cir. 1973) (reversing where government threatened to prosecute witness if he testified in pending trial). However, no due process violation exists "so long as the investigation of witnesses is not prompted by the possibility of the witnesses testifying, and so long as the government does not harass or threaten them." Whittington, 783 F.2d at 1219-20; *see* United States v. Fricke, 684 F.2d 1126, 1130 (5th Cir. 1982) (finding no due process violation

25

when prosecution told witnesses, during trial, that they were subjects of grand jury investigation), *cert. denied*, 460 U.S. 1011 (1983).

The record here does not support appellants' charges of prosecutorial intimidation. The government's investigation of Pickering was completely unrelated to his prospective testimony. The district court was entitled to conclude that the government sought neither to threaten or harass and that the prosecutor's remarks to the court were made to advise it of potential lines of cross-examination. The court's denial of Sellers and Dupre's motion for mistrial for purported prosecutorial misconduct was not an abuse of discretion.

Likewise, the district court did not abuse its discretion in refusing to grant a continuance. The denial of a defendant's motion for continuance will be reversed only when the district court abused its discretion and the defendant suffered serious prejudice. United States v. Scott, 48 F.3d 1389, 1393 (5th Cir.), *cert. denied*, 116 S. Ct. 264 (1995). To obtain a continuance on the grounds of unavailability of a witness, the movant must show (1) that due diligence was exercised to obtain the attendance of the witness; (2) that the witness would tender substantial favorable evidence; (3) that a witness was available and willing to testify; and (4) that the denial of a continuance would materially prejudice the defendant. Id. at 1394 (upholding denial of continuance where defendant failed to demonstrate due diligence in obtaining expert witness or that testimony would be favorable).

26

Here, the court concluded that Pickering's testimony was cumulative in light of the testimony of another defense witness, a former OTSB employee who testified as to the relationship between OTSB and its subsidiaries. The court's denial of a continuance, in light of this finding, was not an abuse of discretion.

VI.

The government cross-appeals the district court's restitution order and its ruling on a proposed obstruction of justice enhancement under the sentencing guidelines with regard to Sellers. The government raised serious questions about whether Sellers had concealed assets from the district court through a variety of financial transactions and sought to present evidence to that effect. The district court refused to consider the evidence, concluding that:

> to attempt to get into an investigation, an analysis of whether Mr. Sellers has assets that he failed to report and whether the amount of those assets that he failed to report would or would not affect a restitution order would, I feel, unduly complicate and prolong the sentencing process. For the record, it has been, I think, seven or eight months since the trial has been completed and a number of delays in sentencing and we need to go forward with that.

After noting that the Resolution Trust Corporation could pursue civil litigation to discover and recover additional funds on behalf of the bank, the court declined to determine the total amount of restitution possible and ordered Sellers to pay partial restitution of $2,000,000.[14]

---

[14]The outstanding balanced owed to OTSB was approximately $36 million.

The district court acted pursuant to the restitution provisions of the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. §§ 3663-3664. Under § 3663(a), a court may decline to order restitution "[t]o the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims." 18 U.S.C. 3663(a)(1)(B)(ii); *see also* U.S.S.G. § 5E1.1(b). Yet, the VWPA also requires a court to consider defendant's ability to pay. 18 U.S.C. § 3663(a)(1)(B)(i)(II). The government argues that the restitution order is erroneous because the "complication and prolongation" exemption provision does not allow a court to avoid considering a defendant's financial resources; such a reading, it contends, would privilege sophisticated defendants who are able to hide their assets from the court.

The language of the exemption provision gives the district court a certain amount of discretion in determining whether to consider additional evidence in assessing restitution. However, thus far, courts have exercised that discretion infrequently and only when considering difficult issues of causation or speculative loss. *See, e.g.*, United States v. Fountain, 768 F.2d 790, 802 (7th Cir. 1985) ("[P]rojecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute."), *cert. denied*, 475 U.S. 1124 (1986); United States v. Bengimina, 699 F. Supp. 214, 218-19 (W.D. Mo. 1988) (refusing to allow "excessive satellite litigation" to

28

evaluate worth of bankrupt corporation because of complicated issues of proof). Legislative history suggests that § 3663(a) is directed at avoiding the lengthy resolution of those sorts of questions. *See* S. Rep. No. 104-132, at 19, *reprinted in* 1996 U.S.C.C.A.N. 924, 932 ("[I]t is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution."). But the language of § 3663(a) does not limit its application only to those instances involving causation or loss.

We agree that the discretionary language of the statute may encompass cases where the assessment of full restitution requires extensive hearings to determine the defendant's financial resources and where, as a result, the sentencing process is inordinately delayed. The record before us does not indicate the level of complexity involved in such a determination here. Without a more fully developed record and specific findings on the complexity of the issues relating to Sellers' ability to pay, we are unable to review the district court's refusal to consider relevant evidence. For these reasons, we remand for reconsideration of the government's request for an evidentiary hearing and for more specific findings.

The court's refusal to consider enhancing Sellers' sentence for obstruction of justice, on the other hand, directly conflicts with the dictates of the Sentencing Guidelines. We review a sentencing court's factual findings for clear error and its application of the Sentencing Guidelines *de novo*. United States v.

29

<u>Dean</u>, 59 F.3d 1479, 1494 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 794 (1996). Section 3C1.1 of the U.S. Sentencing Guidelines instructs the court:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instance offense, increase the offense level by 2 levels.

U.S. Sentencing Guidelines Manual § 3C1.1 (1995). One of the examples of the types of conduct to which the enhancement applies includes "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." § 3C1.1 comment. (n.3(h)). The commentary defines "material" information as information "that, if believed, would tend to influence or affect the issue under determination." § 3C1.1 comment. (n.5). This court has recognized that "[t]he application of § 3C1.1 is not discretionary." *See* <u>United States v. Humphrey</u>, 7 F.3d 1186, 1189 (5th Cir. 1993) (remanding for factual finding on whether defendant had committed perjury).

The district judge refused to consider evidence supporting an obstruction of justice enhancement. Because she had already decided not to order full restitution, she concluded that any evidence that Sellers misrepresented his financial resources would be immaterial. We disagree. "A statement to a probation officer concerning one's financial resources will obviously affect the officer's determination of ability to pay." <u>United States v. Cusumano</u>, 943 F.2d 305, 316 (3d Cir. 1991), *cert. denied*, 502 U.S. 1036 (1992). In fact, the probation officer in this case told the court that, "had I discovered there was additional properties out

30

there I would have changed my Pre-Sentence Report to a two point enhancement. I also would have made a recommendation for much higher restitution." Because we are not persuaded that Sellers' alleged misrepresentations to the probation officer were immaterial, we remand for specific factual findings. To resolve this enhancement issue, the district court need not necessarily conduct a full-blown evidentiary hearing to fully unravel Sellers' various financial transactions; rather, it must simply ascertain whether he misrepresented the nature and extent of his financial resources to the probation officer such that an enhancement is warranted.

## VII.

In sum, we affirm the convictions of Seller and Dupre on all counts. As to Dupre, we also affirm his sentence. However, we vacate Sellers' sentence and remand for reconsideration of his restitution order and the government's proposal to enhance Sellers' sentence for obstruction of justice.

Accordingly, the judgment of the district court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.

DENNIS, Circuit Judge, concurring in part and dissenting in part.

I respectfully concur in the majority opinion in affirming the convictions, except that I have difficulty with assuming that the district court committed error in failing to submit the issue of materiality to the jury in its bank fraud instruction without correlatively assuming that materiality is an element of the offense and that the error is now plain. Nevertheless, I concur in the majority's result because I do not believe that, under a complete analysis of the circumstances of the present case, the error affected the defendants' substantial rights or seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

I respectfully dissent from the majority's decision to vacate Sellers' sentence and remand for reconsideration of the restitution order. As the majority opinion indicates, 18 U.S.C. §3663(a)(1)(B)(ii) states that "[t]o the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order." This provision makes it clear that restitution may be declined to the extent that the court finds that the difficulties in fashioning an order outweigh the need for restitution. *See* U.S.S.G. § 5E1.1(b);

32

*U.S. v. Smith*, 944 F.2d 618, 622-23 (9th Cir. 1991), *cert. denied*, 503 U.S. 951 (1992); *see also U.S. v. C. R. Bard, Inc.*, 848 F.Supp. 287, 292 (D. Mass. 1994); William M. Acker, Jr., Making Sense of Victim Restitution: A Critical Perspective, 6 Fed. Sent. R. 234 (1994). Considering the multiple delays and extended period covered by the sentencing hearing prior to the government's proffer of new evidence and the additional complication and prolongation of the sentencing process portended thereby, the district court's determination that the difficulties entailed in allowing the opening of new areas of litigation outweighed the need for additional restitution was reasonable and not an abuse of discretion.

I qualifiedly concur in the majority's decision to vacate and remand with respect to the government's proposal to enhance Sellers' sentence. Like the majority, I have been unable to determine whether the alleged false statement was material. Section 3C1.1 of the Guidelines provides that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." Application Note 3 thereunder, in pertinent part, provides: "The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies: . . . (h) providing materially false information to a probation officer in respect to a presentence or other investigation for the court." Application Note 5 states:

33

"'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  The alleged false statement would not have been material if the only issue before the court for determination that might have been affected by it was the question of additional restitution, which the district court had reasonably foreclosed in order to avoid excessive prolongation and complication of the sentencing process.  *United States v. Cusumano*, 943 F.2d 305, 316 (3d Cir. 1991), *cert. denied*, 502 U.S. 1036 (1992), may be inapposite because the misstatement of ability to pay there tended to affect the probation officer's recommendation as to fines, an issue still under determination.  On the other hand, the alleged false statement in the present case would be material if there were other issues still under determination that the alleged false statement, if believed, would tend to affect.